# United States Court of Appeals for the Federal Circuit

_____

**NATIONAL ORGANIZATION OF VETERANS'
ADVOCATES, INC., PETER CIANCHETTA,
MICHAEL REGIS, ANDREW TANGEN,**
*Petitioners*

**v.**

**SECRETARY OF VETERANS AFFAIRS,**
*Respondent*

_____

2020-1321

_____

Petition for review pursuant to 38 U.S.C. Section 502.

_____

Decided:  December 8, 2020

_____

ROMAN MARTINEZ, Latham & Watkins LLP, Washington, DC, argued for petitioners.  Also represented by SHANNON MARIE GRAMMEL, BLAKE STAFFORD.

ERIC P. BRUSKIN, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent.  Also represented by JEFFREY B. CLARK, MARTIN F. HOCKEY, JR., ROBERT EDWARD KIRSCHMAN, JR.; Y. KEN LEE, JULIE HONAN, Office of General Counsel, United States Department of Veterans Affairs, Washington, DC.

MELANIE L. BOSTWICK, Orrick, Herrington & Sutcliffe LLP, Washington, DC, for amicus curiae Military-Veterans Advocacy Inc.  Also represented by JAMES ANGLIN FLYNN; JEFFREY T. QUILICI, Austin, TX; JOHN B. WELLS, Law Office of John B. Wells, Slidell, LA.

STEPHEN BLAKE KINNAIRD, Paul Hastings LLP, Washington, DC, for amici curiae National Veterans Legal Services Program, Paralyzed Veterans of America, Veterans of Foreign Wars.  Also represented by ALEX SCHULMAN.  Amicus curiae National Veterans Legal Services Program also represented by BARTON F. STICHMAN, National Veterans Legal Services Program, Washington, DC.

ANGELA K. DRAKE, Veterans Clinic, University of Missouri School of Law, Columbia, MO, for amicus curiae National Law School Veterans Clinic Consortium.

—————————

Before PROST, *Chief Judge*, NEWMAN, LOURIE, DYK, O'MALLEY, REYNA, WALLACH, TARANTO, CHEN, HUGHES, and STOLL, *Circuit Judges*.[1]

DYK, *Circuit Judge.*

National Organization of Veterans' Advocates, Inc., ("NOVA"), Peter Cianchetta, Michael Regis, and Andrew Tangen petition this court under 38 U.S.C. § 502 to review two interpretive rules that are set out in two provisions of the Veterans Affairs ("VA") Adjudication Procedures Manual M21-1 (the "Manual") and a Federal Register publication.  The first interpretive rule, the Knee Joint Stability Rule, was promulgated on April 13, 2018, and is set forth in Section III.iv.4.A.6.d of the Manual.  It assigns a joint instability rating under Diagnostic Code ("DC") 5257, 38 C.F.R. § 4.71a, based on the amount of movement that

---

[1]    Circuit Judge Moore did not participate.

occurs within the knee joint. The second interpretive rule, the Knee Replacement Rule, provides that evaluation under DC 5055, 38 C.F.R. § 4.71a, is not available for partial knee replacement claims. The Knee Replacement Rule was first published in the Federal Register. That publication announced that section 4.71a was amended to include an explanatory note that "'prosthetic replacement' means a total, not a partial, joint replacement," 80 Fed. Reg. 42,040, 42,041 (July 16, 2015). The Knee Replacement Rule was later published in a somewhat different form in a Manual provision, which was promulgated on November 21, 2016, and is currently located in Section III.iv.4.A.6.a of the Manual. The Manual provision informs regional office staff that evaluation under DC 5055, 38 C.F.R. § 4.71a, is not available for partial knee replacement claims filed and decided on or after July 16, 2015.

We conclude that NOVA has standing because it has veteran members who are adversely affected by the challenged Rules. We also conclude that the Knee Joint Stability Rule Manual provision is an interpretive rule reviewable under section 502 and that it constitutes final agency action. As to the Knee Replacement Rule, we also conclude that we have jurisdiction under section 502 and that it is final agency action. However, we leave to the merits panel the question whether the Knee Replacement Manual provision or the Federal Register publication constitutes the reviewable agency action. We thus conclude that we have jurisdiction over the petition for review.

We also hold that the petitioners' challenge is timely under the six-year statute of limitations provided by 28 U.S.C. § 2401(a) and that Federal Circuit Rule 15(f), establishing a 60-day time limit for bringing section 502 petitions, is invalid.

We refer this case to a panel for adjudication on the merits.

BACKGROUND

Petitioners seek review of two interpretive rules governing disability claims for service-related knee injuries. The first rule, the Knee Joint Stability Rule, was promulgated in the Manual in April 2018 and addresses the rating schedule for knee instability under DC 5257, 38 C.F.R. § 4.71a. The governing regulation assigns a 30 percent rating for "Severe" joint instability, a 20 percent rating for "Moderate" joint instability, and a 10 percent rating for "Slight" joint instability. DC 5257, 38 C.F.R. § 4.71a. In turn, the Knee Joint Stability Rule instructs VA regional office staff to assign a slight knee instability rating for 0–5 mm of joint translation, a moderate rating for 5–10 mm of joint translation, and a severe rating for 10–15 mm of joint translation.

In 2017, VA published a notice of proposed rulemaking in the Federal Register proposing a nearly identical measurement-based assessment method for knee instability claims. According to petitioners, however, "multiple commenters complained that the measurement-based schedule for grading knee instability was too subjective and prone to error, insofar as it is affected by the amount of pressure applied by the physician. They also complained that the new schedule focused too narrowly on a rigid measurement, and thus would not account for the actual, functional loss suffered by veterans." Pet'r's Br. 14. VA did not adopt the proposed rule and instead promulgated the Knee Joint Stability Rule in the Manual, which incorporates essentially the same measurement-based grading schedule. Petitioners argue that the Knee Joint Stability Rule is subjective and therefore "arbitrary and capricious and must be set aside." Pet'r's Br. 14.

The second rule is the Knee Replacement Rule. Different versions of the Rule are set forth in a Federal Register notice and a Manual provision. The governing regulation, DC 5055, 38 C.F.R. § 4.71a, provides for a minimum 100

percent disability rating "[f]or 1 year following implantation of [a] prosthesis." The Federal Register notice was published in July 2015 and explained that "VA is adding an explanatory note under 38 CFR 4.71a . . . which notifies readers that 'prosthetic replacement' means a total, not a partial, joint replacement, except as it is otherwise stated under DC 5054." 80 Fed. Reg. 42,040, 42,041 (July 16, 2015) ("2015 Interpretive Guidance"). The Knee Replacement Manual provision was promulgated in November 2016 and addresses disability ratings for knee replacements under DC 5055, 38 C.F.R. § 4.71a. The Knee Replacement Manual provision instructs VA regional office staff not to apply this diagnostic code when evaluating partial knee replacement claims filed and decided on or after July 16, 2015.

Petitioners argue that the Knee Replacement Rule violates this court's decision in *Hudgens v. McDonald*, which concluded that the Veterans Court "erred in its judgment that DC 5055 is limited to instances of full knee replacement." 823 F.3d 630, 637 (Fed. Cir. 2016). In so holding, this court addressed the 2015 Interpretive Guidance, stating that "we cannot ignore that, during the pendency of this appeal, the agency found the need to clarify the language" of the governing regulation and that "[s]uch '*post hoc* rationalization' does not warrant deference under *Auer*," that is, deference to the agency's own interpretation of its regulation. *Id.* at 639. Petitioners contend that nothing in *Hudgens* suggests that VA can "apply its flawed interpretation of DC 5055 to claims filed after the 2015 Interpretive Guidance." Pet'r's Br. 12. Therefore, petitioners argue that "[t]he Knee Replacement Rule violates *Hudgens* and is unlawful." *Id.* at 13.

On January 3, 2020, NOVA filed a petition for review that, as amended on October 23, 2020, challenged these two interpretive rules. Petitioners argued that this court has jurisdiction over their petition because both Rules "qualify as interpretive rules for purposes of Section 502."

Am. Pet. 2. They asked this court to overrule *Disabled American Veterans v. Secretary of Veterans Affairs* ("*DAV*"), 859 F.3d 1072 (Fed. Cir. 2017), which held that this court lacked section 502 jurisdiction to review interpretive rules promulgated in the Manual.

The petition for review further stated that its challenge was timely under 28 U.S.C. § 2401(a), which provides a six-year statute of limitations governing civil actions brought against the United States. However, petitioners acknowledged that their challenge was not timely under Federal Circuit Rule 47.12(a), now Federal Circuit Rule 15(f) with minor language changes, which states that an "action for judicial review under 38 U.S.C. § 502 of a rule and regulation of the Department of Veterans Affairs must be filed with the clerk of court within 60 days after issuance of the rule or regulation or denial of a request for amendment or waiver of the rule or regulation." Petitioners argued that this "60-day limitations period impermissibly conflicts with the six-year statute of limitations made applicable to Section 502 civil actions by Section 2401(a)." Am. Pet. 5. It therefore asked this court to "resolve the conflict" and set aside rule 15(f). *Id.* at 6.

We granted en banc review and asked that the parties address two issues:

> A. Whether this court has jurisdiction under 38 U.S.C. § 502 to review provisions of the Department of Veterans Affairs' Adjudication Procedures Manual M21-1 that are binding on the agency's initial adjudicators but not on the Board of Veterans' Appeals, and whether this court should overrule *Disabled American Veterans v. Secretary of Veterans Affairs*, 859 F.3d 1072 (Fed. Cir. 2017).
>
> B. Whether the time for filing a direct action for judicial review under

> 38 U.S.C. § 502 is governed by the 60-day deadline specified by Federal Circuit Rule 47.12(a) or only by the six-year statute of limitations in 28 U.S.C. § 2401(a).

Order Granting En Banc Review, No. 20-1321 (May 6, 2020), ECF 50, at 3.

The government's opening brief did not oppose NOVA's standing to challenge the two Knee Rules. However, pursuant to our independent duty to verify standing, we asked for supplemental briefing to address three questions relating to NOVA's standing:

> (1) Are the allegations of the Petition sufficient to establish standing, even without any evidence from NOVA, given that the Secretary does not challenge standing, or must NOVA submit evidence to establish Article III standing, *see Phigenix, Inc. v. Immunogen, Inc.*, 845 F.3d 1168, 1171–73 (Fed. Cir. 2017); *Shrimpers & Fishermen of RGV v. Texas Commission on Environmental Quality*, 968 F.3d 419, 423–24 (5th Cir. 2020) (citing cases from six other circuits)?
>
> (2) Is there evidence that, at the time of the Petition, NOVA had members with standing to challenge the provisions at issue?
>
> (3) Does NOVA have standing on any basis apart from having had members who would have had standing to challenge the provisions at issue?

Order Requesting Supplemental Briefing, No. 20-1321 (Sept. 15, 2020), ECF 87, at 1–2.

In response, NOVA argued that its petition sufficiently established that it had associational standing because "NOVA's allegations in its petition in this case match—nearly verbatim—the allegations deemed sufficient in [*Disabled American Veterans v. Gober*, 234 F.3d 682 (Fed. Cir. 2000)]." Pet'r's Suppl. Br. 5. NOVA alternatively argued that "many of NOVA's veteran members—including Mr. Cianchetta, Mr. Tangen, and Mr. Regis—currently suffer from knee disabilities and have been receiving, or are currently seeking, disability benefits governed by the Knee Rules." *Id.* at 8. In support, NOVA submitted declarations from these three veteran members. NOVA also argued that "NOVA has many attorney members who are adversely affected by the Knee Rules because those rules diminish the contingency fees they will be able to earn, and the business they will be able to retain, by representing veterans in disability claims proceedings before VA." *Id.* at 10. NOVA submitted declarations from attorney members alleging that the Knee Rules affect their ability to earn contingency fees and retain clients. In response to our order, the government for the first time challenged NOVA's standing, arguing that NOVA had not established that it met the requirements for associational standing.

Following oral argument, NOVA moved for permission to amend its petition for review to include an additional challenge to the 2015 Interpretive Guidance published in the Federal Register and to add three veteran members as named petitioners. We granted NOVA's unopposed motion and permitted it to file an amended petition.[2]

---

[2] Exercising our discretion, we granted permission to add these named petitioners under the circumstances here. As we discuss, NOVA's associational standing to challenge the Knee Rules does not depend on the joinder of these individuals.

## DISCUSSION

### I.  Standing

This court has an "independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).  We first consider NOVA's associational standing based on claimed injury to its veteran members (as opposed to its claim of standing based on its lawyer members).

As an organization, NOVA would have associational standing to challenge the Rules at issue if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  NOVA carries a burden to prove standing that is the same as that applied at summary judgment.  *Phigenix, Inc.*, 845 F.3d at 1172–73 (adopting the summary judgment burden of production in cases challenging final agency action); *see also Shrimpers & Fishermen of RGV* , 968 F.3d at 423 (same).

NOVA's petition asserted that "[m]any of NOVA's members are veterans" and that those members are "personally affected" by the challenged Manual provisions because "they will be directly harmed when they bring their own claims for benefits." Original Pet. 6.  The petition did not name such individual members.  NOVA additionally stated that its challenge to the two Manual provisions was "germane to NOVA's purpose" of providing "representation for all persons seeking benefits through the federal veteran's benefits system, and in particular those seeking judicial review of denials of veterans' benefits." *Id.* at 6–7 (quoting *Gober*, 234 F.3d at 689) (internal quotation marks omitted).  Finally, NOVA explained that its challenge "d[id] not require the participation of NOVA's individual

members" because the petition "presents a pure question of law: whether VA's promulgation of each rule was legally valid" under the Administrative Procedure Act ("APA"). *Id.* at 7.

NOVA argues that under its original petition it has associational standing to challenge both Rules "for essentially the same reasons this Court expressly held that NOVA had standing in *DAV v. Gober*," which is because it has veteran members. *Id.* at 6. *Gober* addressed NOVA's standing to challenge VA's promulgation of rules concerning the application of the clear and unmistakable error ("CUE") standard in VA proceedings. 234 F.3d 682, 689 (Fed. Cir. 2000). The *Gober* court found that NOVA satisfied the first prong of associational standing because "NOVA includes at least one veteran as a member." *Id. Gober* did not require the identification of association members affected by the new CUE rules. *Id.* The *Gober* court additionally found that NOVA's challenge to the CUE rules was "germane" to NOVA's purpose of providing "representation for all persons seeking benefits through the federal veteran's benefits system, and in particular those seeking judicial review of denials of veterans' benefits." *Id.* (internal quotation marks omitted). Because the third prong of associational standing was uncontested, the court found that NOVA had standing. *Id.*

NOVA argues that the "allegations in its petition . . . match—nearly verbatim—the allegations deemed sufficient in *Gober*" and therefore it must necessarily have standing. Pet'r's Suppl. Br. 5. However, we conclude that *Gober* was incorrectly decided insofar as it held that the first prong of the *Hunt* test can be established solely on the basis of NOVA member veteran status without identification of an individual affected member, the nature of his or her claimed injury, and the reasons that the challenged interpretive rule would adversely affect the member. The Supreme Court has made clear that petitioners must make a more "concrete and particularized" showing of injury.

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *see also Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) ("For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'"). As the Court concluded in *Valley Forge Christian College v. Americans United for Separation of Church & State*, "at an irreducible minimum, Art. III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.'" 454 U.S. 464, 472 (1982) (quoting *Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91, 99 (1979)). For example, in *Summers*, the Supreme Court held that an environmental group failed to establish standing to challenge Forest Service regulations because respondents failed to identify an "application of the invalidated regulations that threaten[ed] imminent and concrete harm to the interests of their members." 555 U.S. at 494–96.

To the extent *Gober* found *Hunt*'s first prong satisfied based solely on the veteran status of some of NOVA's members, it is overruled. We now hold that when an organization challenges VA rulemaking and invokes the veteran status of a member to meet the first prong of the *Hunt* test for associational standing, the organization must show that the veteran member has an actual or potential claim and that this claim is sufficiently affected by the particular challenged rule to meet the requirements of actual or imminently threatened concrete harm and the other requirements for that member to have Article III standing. *See id.*; *E. Paralyzed Veterans Ass'n, Inc. v. Sec'y of Veterans Affs.*, 257 F.3d 1352, 1356 (Fed. Cir. 2001) (finding associational standing when veterans association showed it had at least one member who was sufficiently affected by the challenged VA regulations).

Under this standard, NOVA has met its burden on *Hunt*'s first prong. In response to our request for supplemental briefing on standing, NOVA submitted declarations

of NOVA members who have "suffered an injury in fact . . . that is fairly traceable to" the alleged shortcomings of each of the two challenged Manual provisions. *Spokeo*, 136 S. Ct. at 1547. For example, Michael Regis has been a member of NOVA since 2018 and is a veteran of the United States Air Force. He was diagnosed with knee instability in 2016 and is currently seeking benefits under DC 5257. Because of his instability diagnosis, Mr. Regis states that he faces a substantial risk of being denied the disability rating to which he believes he is entitled based on the regional office's application of the Knee Joint Stability Rule.

Andrew Tangen has been a member of NOVA since 2017 and is a veteran of the United States Navy. He received a 10 percent disability rating under DC 5257 on September 21, 2018, which was after the Knee Joint Stability Rule took effect. He states that he faces an ongoing injury from having his disability rating governed by the Knee Joint Stability Rule.

Finally, Peter Cianchetta has been a NOVA member since 2017 and is a veteran of the United States Air Force. Mr. Cianchetta was referred for partial knee replacement surgery on October 26, 2019, and received a partial knee replacement on September 14, 2020. He states that he faces imminent denial of his claim for benefits under the Knee Replacement Rule.

This evidence is sufficient to meet the summary judgment burden of production applied to direct challenges of agency action. *Phigenix*, 845 F.3d at 1172–73; *see also Lujan*, 504 U.S. at 561 (noting that, "[i]n response to a summary judgment motion," the plaintiff "must 'set forth' by affidavit or other evidence 'specific facts,' Fed. Rule Civ. Proc. 56(e) [supporting his or her standing], which for purposes of the summary judgment motion will be taken to be true").

Although each of the declarants states that he faces an ongoing or imminent injury from the challenged provisions,

the government makes only one argument for why none of them meets the first prong of *Hunt*—namely, that none of them had a knee joint stability or partial knee replacement claim pending before a regional office when NOVA filed its petition for review. However, Supreme Court precedent makes clear that standing does not require a pending adjudicative proceeding in order to generate a cognizable Article III injury.

For example, the Supreme Court has affirmed the standing of regulated entities to bring pre-enforcement challenges to agency action. *See Abbott Lab'ys v. Gardner*, 387 U.S. 136, 153–54 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). In the patent context, a pending infringement action is not required to establish standing to challenge patent validity. *See Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1339 (Fed. Cir. 2008) ("A patentee can cause such an injury in a variety of ways, for example, by creating a reasonable apprehension of an infringement suit, . . . demanding the right to royalty payments, . . . or creating a barrier to the regulatory approval of a product that is necessary for marketing . . . ."). Similarly, in the criminal context, "an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging" a law. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014); *see also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007) ("[W]here threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat— for example, the constitutionality of a law threatened to be enforced." (emphasis removed)). Here, too, NOVA is not required to prove that it had a member with a pending knee instability or knee replacement claim in order to meet *Hunt*'s first requirement for associational standing. We therefore conclude NOVA has met the first requirement for associational standing under the *Phigenix* standard.

To satisfy the second prong of the associational standing test, NOVA must show that "the interests it seeks to protect are germane to the organization's purpose." *Hunt*, 432 U.S. at 343. The government argues that NOVA's petition is not germane to NOVA's purpose because "NOVA's stated purposes are focused, naturally, on ensuring that its members, as advocates, offer quality, informed representation to veterans seeking benefits from VA." Resp't. Suppl. Br. 13. It is true that the five enumerated purposes in NOVA's bylaws are directed toward improving the services NOVA's lawyer members provide to their veteran clients. However, the government's view of NOVA's purposes is too narrow. As we found in *Gober*, NOVA's general purpose is to aid veterans in obtaining benefits. 234 F.3d at 689; *see also* Pet'r's Suppl. Br. Tab 5, Ex. A (stating that NOVA aims "[t]o develop and encourage high standards of service and representation for all persons seeking benefits through the federal veterans' benefits system and in particular those seeking judicial review of denials of veterans' benefits"); *id.* at Tab 5, Decl. of Diane Boyd Rauber ("NOVA's overarching purpose [in the cases it brings to challenge VA agency action] is to . . . ensure that veterans are treated fairly and receive the benefits they are due under law . . . ."). NOVA's mission is therefore focused on helping veterans obtain fair compensation for their claims. This interest in fair adjudication of veteran disability benefits is precisely the interest NOVA now seeks to protect in challenging these two interpretive rules. NOVA has consequently shown that it "will . . . have a stake in the resolution of the dispute, and thus be in a position to serve as the defendant's natural adversary." *United Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555–56 (1996).

Finally, NOVA's challenge to the Rules does not require "individualized proof" because this case presents a purely legal question asking whether VA's Knee Joint Stability and Knee Replacement Rules are unlawful under the

Administrative Procedure Act. *Hunt*, 432 U.S. at 344. Nor does the government contend otherwise. NOVA has sufficiently shown that it has associational standing to challenge the Knee Joint Stability Rule and the Knee Replacement Rule.

We note that NOVA additionally argues that it "satisfies the first associational standing prong" because "NOVA has many attorney members who are adversely affected by the Knee Rules because those rules diminish the contingency fees they will be able to earn, and the business they will be able to retain, by representing veterans in disability claims proceedings before VA." Pet'r's Suppl. Br. 7, 10. Because we find that NOVA has established standing based on the harm suffered by its veteran members, we need not reach the standing of its lawyer members. Similarly, although NOVA argues that it additionally has organizational standing on behalf of its lawyer members, we need not reach this issue.

## II. Jurisdiction Under Section 502 – The Knee Joint Stability Rule

We turn to the question of jurisdiction. For reasons we will explain below, we deal separately with the Knee Joint Stability Rule and the Knee Replacement Rule. Under section 502, this court may review "[a]n action of the Secretary to which section 552(a)(1) or 553 of title 5 (or both) refers." 38 U.S.C. § 502.

### A. 5 U.S.C. § 553

Initially, we consider whether the Knee Joint Stability Rule constitutes "an action of the Secretary to which section . . . 553 of title 5 . . . refers." *Id.* Section 553 governs the notice-and-comment rulemaking process under the APA. It states that "[g]eneral notice of proposed rule making shall be published in the Federal Register . . . [and] [a]fter notice required by this section, the agency shall give interested persons an opportunity to participate in the rule

making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(b), (c). Additionally, it provides that "[e]ach agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule." *Id.* § 553(e). NOVA does not suggest that the Knee Joint Stability Rule is a substantive rule that should have gone through notice-and-comment under section 553. Nor does it argue that it was denied "the right to petition for the issuance, amendment, or repeal" of the Rule under section 553(e). Instead, NOVA contends that, even though the Knee Joint Stability Rule was not promulgated through notice-and-comment rulemaking, it is still reviewable because "[s]ection 553 repeatedly refers to 'interpretive rules,'" i.e., it exempts them from notice and comment rulemaking. Pet'r's Br. 45; *see* 5 U.S.C. § 553(b)(A), (d).

It is implausible on its face that Congress encompassed exemptions when it referenced, in section 502, "[a]n action . . . to which section . . . 553 . . . refers." The more plausible meaning limits the scope to the actions to which section 553's requirements *pertain*, i.e., *apply*, not action that section 553 declares outside its requirements. *See* Webster's II New College Dictionary 953 (3d ed. 2005) ("1. To pertain: concern"); *pertain*, Oxford English Dictionary (3d ed. 2005) ("4. *Intransitive*. To apply; to be or remain in place, to continue to be applicable."). Section 553 provides several exemptions from its notice-and-comment and publication requirements. In addition to exempting "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice," it also exempts provisions involving "a military or foreign affairs function of the United States" or "a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts." 5 U.S.C. § 553(a)–(b). There can be no suggestion that section 502 permits review of agency action that falls within one of these section 553 exemptions, even if it is outside section 552(a)(1). *See, e.g., Conyers v. Sec'y*

*of Veterans Affs.,* 750 F. App'x 993, 997 (Fed. Cir. 2018) (recognizing that section 502 jurisdiction does not apply to agency action within the "personnel exception" of section 553 unless the agency action also falls under section 552(a)(1)). Section 502's "refers" language is not so broad as to encompass agency action expressly excluded from section 553's procedures. We therefore do not have jurisdiction to review these Rules as agency action to which section 553 "refers."

### B.    5 U.S.C. § 552(a)(1)

Section 502 also gives this court jurisdiction over "[a]n action of the Secretary to which section 552(a)(1) . . . refers."[3] Section 552(a)(1) governs agency action that must be published in the Federal Register, such as "substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency." 5 U.S.C. § 552(a)(1)(D). Thus, section 502 provides prompt direct review by this court of "statements of general policy" and "interpretations of general applicability" in addition to "substantive rules of general applicability." *Id.*[4]

---

[3]    Section 502 provides in pertinent part:

An action of the Secretary to which section 552(a)(1) or 553 of title 5 (or both) refers is subject to judicial review. Such review shall be in accordance with chapter 7 of title 5 and may be sought only in the United States Court of Appeals for the Federal Circuit.

[4]    Sections 552(a)(1) and 552(a)(2) provide in relevant part:

(a) Each agency shall make available to the public information as follows:

In our earlier decision in *DAV*, we held that we did not have jurisdiction to review a Manual provision addressing the definition of a medically unexplained chronic multi-symptom illness.  859 F.3d 1072, 1078 (Fed. Cir. 2017).  The decision explained that "Congress expressly exempted from § 502 challenges to agency actions which fall under § 552(a)(2)." *Id.* at 1077–78; *see also id.* at 1075 ("Section 502's express exclusion of agency actions subject to § 552(a)(2) renders the M21-1 Manual beyond our § 502 jurisdiction unless DAV can show the VA's revisions more readily fall under §§ 552(a)(1) or 553.").  The government has agreed that reading sections 552(a)(2) and 552(a)(1) as being mutually exclusive is incorrect because "[i]n some respects, the criteria that Section 552(a)(1) and (2) establish

---

> (1)    Each agency shall separately state and currently publish in the Federal Register for the guidance of the public—
> 
> \*\*\*
> 
> (D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency; and
> 
> \*\*\*
> 
> (2) Each agency, in accordance with published rules, shall make available for public inspection in an electronic format—
> 
> \*\*\*
> 
> (B) those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register;
> 
> (C) administrative staff manuals and instructions to staff that affect a member of the public; . . .
> 
> \*\*\*

overlap."  Respondent Brief in Opposition at 22–23, *Gray v. Wilkie*, 139 S. Ct. 2764 (2019) (No. 17-1679), 2018 WL 4298030; *see also Procopio v. Sec'y of Veterans Affairs*, 943 F.3d 1376, 1379–80 (Fed. Cir. 2019) (exercising section 502 jurisdiction over a VA memorandum instructing staff to stay certain benefits decisions, without addressing the fact that it constituted an instruction to staff under section 552(a)(2)(C), because the memorandum constituted an interpretation of general applicability under section 552(a)(1)).  The government also concedes that whether an interpretive rule is actually published in the Federal Register does not dictate whether this court has jurisdiction, as "VA cannot insulate a rule from pre-enforcement review simply by placing it in the Manual."  Resp't Br. 30.  The government nevertheless argues that we do not have jurisdiction to review Manual provisions under section 502 for other reasons.

Because we find that the Knee Joint Stability Rule falls within the "general applicability" language of section 552(a)(1)(D), we overrule our contrary holding in *DAV*.  We start with the Supreme Court's premise that "many [agency] manual instructions surely qualify as guidelines of general applicability." *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1814 n.1 (2019).  The VA Manual provision governing knee joint stability is one of them.  The Knee Joint Stability Rule governs benefits received under DC 5257, 38 C.F.R. § 4.71a.  The Manual provision announces VA's adoption of an interpretive rule establishing a new metric for assessing knee instability claims.  It limits VA staff discretion, and, as a practical matter, impacts veteran benefits eligibility for an entire class of veterans.  On its face, the Knee Stability Rule is an "interpretation[] of general applicability" because it governs all regional office adjudications of knee instability claims, affecting an open-ended category of veterans with knee instabilities.  5 U.S.C. § 552(a)(1).

The history of section 552 supports our conclusion that the Knee Joint Stability Rule is "of general applicability." Congress has long used the phrase "of general applicability" to differentiate between government action that applies to a general segment of the public rather than to specific named individuals. For example, in 1935 Congress passed the Federal Register Act ("FRA"), which required publication of "such documents or classes of documents as the President shall determine from time to time have *general applicability* and legal effect." Pub. L. No. 74-220, § 5(a)(2), 49 Stat. 500, 501 (1935) (emphasis added). In 1937, the FRA was amended to add a requirement that agency documents "hav[ing] *general applicability* and legal effect" be published in what became the Code of Federal Regulations. Pub. L. No. 75-158, § 11(a), 50 Stat. 304, 304 (1937) (emphasis added). Regulations implementing this new codification requirement clarified that documents of "general applicability and legal effect" were those "relevant or applicable to the general public, the members of a class, or the persons of a locality, as distinguished from named individuals or organizations." 2 Fed. Reg. 2450, 2451-52 (Nov. 12, 1937).

In 1946, Congress enacted the APA, which also addressed publication of rules in the Federal Register. Section 2(c) of the APA utilized the same "general applicability" language appearing in the FRA, defining "Rule" as "the whole or any part of any agency statement of *general or particular applicability* and future effect designed to implement, interpret, or prescribe law or policy or to describe the organization, procedure, or practice requirements of any agency." Pub. L. No. 79-404, § 2(c), 60 Stat. 237, 237 (1946) (emphasis added). The distinction between an agency statement of "general" as opposed to "particular applicability" was explained in a House Report, which noted that the phrase "or particular applicability" was added to "assure coverage of rulemaking addressed to named persons," indicating that "general . . . applicability"

was understood as excluding such rules.  H.R. Rep. No. 79-1980 at 283, n.1 (1946) (Comm. Amendment).

Under Section 3(a) of the original APA, agencies were required to "separately state and currently publish in the Federal Register" specific agency action including "substantive rules adopted as authorized by law and statements of general policy or interpretations formulated and adopted by the agency for the guidance of the public, but not rules addressed to and served upon named persons in accordance with law."  Pub. L. No. 79-404, § 3(a)(3), 60 Stat. 237, 238.

In 1966, Congress enacted the Freedom of Information Act ("FOIA") and moved the APA's Federal Register publication requirement to section 3 of FOIA.  Pub. L. No. 89-487, § 3(a), 80 Stat. 250, 250 (1966).  This provision was codified at what is now 5 U.S.C. § 552(a)(1).  Section 552(a)(1) provided that "[e]very agency shall separately state and currently publish in the Federal Register for the guidance of the public" agency documents including "substantive rules of general applicability adopted as authorized by law, and statements of general policy *or interpretations of general applicability* formulated and adopted by the agency."  *Id.* § 3(a)(D) (emphasis added). Thus, FOIA required publication of "interpretations of general applicability" rather than using the previous language—"interpretations formulated and adopted by the agency for the guidance of the public, but not rules addressed to and served upon named persons in accordance with law."  *Compare* Pub. L. No. 89-487, § 3(a) *with* Pub. L. No. 79-404, § 3(a)(3).  Congress described this change as merely "technical" in nature.  S. Rep. No. 89-813, at 6 (1965).[5]  Congress plainly intended "general applicability"

---

[5]    The Attorney General's 1967 memorandum—considered "a reliable guide in interpreting FOIA," *FCC v. AT & T Inc.*, 562 U.S. 397, 409 (2011); *Nat'l Archives &*

to be interpreted as applying generally and "not . . . addressed to and served upon named persons in accordance with law." *Id.* Congress's use of "general applicability" suggests its intent to incorporate the consistent understanding of "general applicability" dating back to the enaction of the FRA. *See Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019) (explaining the "longstanding interpretive principle" that "[w]hen a statutory term is obviously transplanted from another legal source, it brings the old soil with it." (internal quotation marks omitted)). Thus, "general applicability" in section 552(a)(1) is best understood as indicating agency action addressed to a class of persons rather than to named persons or organizations. *See, e.g.*, *Nguyen v. United States*, 824 F.2d 697, 700 (9th Cir. 1987) ("The legislative history thus indicates a rather obvious definition of 'general': that which is neither directed at specified persons nor limited to particular situations.").

The Knee Joint Stability Rule falls easily within the "general applicability" language of section 552(a)(1)(D). The Rule is of general application, applying to all veteran claims for knee joint instability benefits before a VA regional office. Indeed, the government appears to concede that the Knee Joint Stability Rule would be reviewable if it were binding on all agency adjudicators. But the government argues that "[t]o be 'of general applicability,' . . . an interpretation must be 'binding' on the agency and members of the public who interact with the agency." Resp't Br.

---

*Recs. Admin. v. Favish*, 541 U.S. 157, 169 (2004)—explained that the change was "formal only." Attorney General's Memorandum on the Public Information Section of the Administrative Procedure Act 10 (June 1967) (*FOIA Memorandum*). The Attorney General also stated the technical change made sense because "of general applicability" "exclude[s] rules addressed to and served upon named persons." *Id.*

21. The government contends that the Knee Joint Stability Manual provision does not bind the Board of Veterans Appeals and is therefore not a true "interpretation[] of general applicability." § 552(a)(1)(D). Understanding the government's position requires an understanding of the VA adjudicative system.[6]

The VA adjudicates disability benefits claims through a "two-step process." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 431 (2011).[7] Veterans first file a claim before Veterans Benefits Administration ("VBA") staff in one of VA's regional offices, who make "an initial decision on whether to grant or deny benefits." *Id.* "[I]f a veteran is dissatisfied with the regional office's decision, the veteran may obtain *de novo* review by the Board of Veterans' Appeals." *Id.* In order to "provide[] guidance to [VBA] employees and stakeholders" the VA "consolidates its policy and procedures into one resource known as the M21-1 Manual." *DAV*, 859 F.3d at 1074. VBA staff making the initial benefits decisions are bound by policies in the Manual. *Gray v. Sec'y of Veterans Affs.*, 875 F.3d 1102, 1106 (Fed. Cir. 2017), *vacated and remanded by Gray v. Wilkie*, 139 S. Ct. 2764 (2019), *vacated and dismissed as moot by Gray v. Sec'y of Veterans Affs.*, 774 F. App'x 678 (Fed. Cir. 2019). However, while the Board is "required to discuss any relevant provisions contained in the [Manual] as part of its duty to provide adequate reasons or bases" for its decisions, it is not bound by the Manual. *Overton v.*

---

[6]    The government, of course, agrees that interpretive rules do not bind the agency in court proceedings.

[7]    The Veterans Appeals Improvement and Modernization Act of 2017 modified this two-step process by granting veterans a wider range of appeal options following an adverse regional office decision. Pub. L. No. 115-55, 131 Stat. 1105; 38 U.S.C. §§ 5104B, 5104C. However, the parties appear to agree that the two-step process still exists.

*Wilkie*, 30 Vet. App. 257, 264 (2018); *see also* 38 U.S.C. § 7104(c) (explaining that the Board is bound by "regulations of the Department, instructions of the Secretary, and the precedent opinions of the chief legal officer of the Department"). Because the Manual binds regional office staff, but not the Board, the government contends that Manual provisions are not sufficiently "binding" to constitute interpretations of general applicability.

The text and history of section 552(a)(1) do not suggest that the reference to "interpretations of general applicability" excludes interpretive rules that bind only front-line adjudicators. As discussed above, the phrase "of general applicability" is directed only to the question whether the rule applies to a class of persons rather than to selected individuals. In other words, "general applicability" does not refer to general applicability within the agency, but to general applicability to members of the public. The government argues that the legislative history requires "interpretations of general applicability" to be "binding" on agency adjudicators, citing two Congressional reports that accompanied the original APA. Resp't Br. 22. However, these reports do not support the government's interpretation, but instead state that section 3(a) of the APA "forbids secrecy of rules binding <u>or applicable to the public</u>, or of delegations of authority." S. Rep. No. 79-752, 12 (1945) (emphasis added); *see also* H.R. Rep. No. 79-1980, 22 (1946) (similar). The use of the language "binding <u>or</u> applicable to the public" suggests that the "applicable to the public" concept does not mean rules that are "binding." The obligation to publish under section 552(a)(1) does not turn on whether VA action is binding on the Board, but on whether an interpretive rule affects a segment of the general public.[8]

_____

[8]    The government relies on two circuit decisions for the proposition that courts that have considered "nonbinding instructions in agency manuals of the kind at issue here

The government also argues that publication in the Federal Register is only required for matters that "would adversely affect a member of the public." Resp't Br. 25 (quoting *New York v. Lyng*, 829 F.2d 346, 354 (2d Cir. 1987)). Even under that standard, the Knee Joint Stability Rule would need to be published because the Knee Joint Stability Rule adversely affects veterans by denying them benefits to which they would otherwise be entitled without the procedural protections afforded by FOIA as discussed in detail below. The Knee Joint Stability Rule, as a rule of "general applicability," has a substantive effect on veterans

have 'unanimously held that publication in the Federal Register under § 552(a)(1) is not required.'" Resp't Br. 19 (quoting *Capuano v. Nat'l Transp. Safety Bd.*, 843 F.2d 56, 58 (1st Cir. 1988)). However, both cases relied on by the government are distinguishable because they concerned agency manuals that did not have a substantive impact on the rights of the public or did not mark a change in agency practice. *Capuano*, 843 F.2d at 57–58 (finding that a Federal Aviation Administration "enforcement manual" did not need to be published in the Federal Register when it merely informed agency employees that "[s]uspension may be used for punitive purposes" and specified criteria they should use when asking "the Board to impose suspension or a lesser sanction" because the Manual was "not intended to affect the rights, duties, obligations, or conduct of pilots or any other member of the public" as "[a] pilot's obligation . . . is to refrain from those activities that call for a sanction, whether that sanction is strict or lenient"); *Notaro v. Luther*, 800 F.2d 290, 291 (2d Cir. 1986) (finding a Parole Commission training aid did not need to be published in the Federal Register because "the approach set out in the training aid accords with the Commission's regulations and past practices" and "did not establish a presumption of nonperipherality" that mandated a particular result in appellant's parole hearing).

suffering from knee instability, warranting the formal notice that publication in the Federal Register entails.[9]  Significantly, the VA itself once viewed this change to a measurement-based instability rating system as significant enough to warrant following notice and comment procedures.[10]

---

[9]    The government argues that Congress's goal of providing "guidance of the public" through Federal Register publication is "equally, if not better, served by making nonbinding interpretations available online on VA's website."  Resp't Br. 21.  However, the basic VA website does not seem to contain the current version of the Manual.  Instead, the government says that the current Manual is published on the KnowVA website at https://www.knowva.ebenefits.va.gov/system/templates/selfservice/va_ssnew/help/customer/locale/en-US/portal/554400000001018/content/554400000073398/M21-1,%20Adjudication%20 Procedures%20Manual,%20Table%20of%20Contents. Resp't Br. 3 n. 4.  Further, the version of the Manual on the KnowVA site does not explain the role the Manual plays in benefits adjudication.  In contrast, documents published in the Federal Register are aggregated on a single website and presented in a standardized format that includes a summary of "the 'what,' 'why,' and 'effect' of the document" in "language a non-expert will understand." *Document Drafting Handbook*, Office of the Federal Register at 2-5 (Aug. 9, 2019), https://www.archives.gov/files/federal-register/write/handbook/ddh.pdf.  Even in cases where the Federal Register incorporates material by reference, the agency must ensure easy public access by "stating where and how copies may be examined and readily obtained with maximum convenience to the user."  1 C.F.R. § 51.9.

[10]    *See* 82 Fed. Reg. 35,719, 35,723 (Aug. 1, 2017) (publishing a notice of proposed rulemaking that proposed a

We finally note that the Supreme Court has recognized the importance of publishing agency documents like this in the Federal Register, although it based its holding on the agency's own internal publication procedures rather than on section 552(a)(1).  *Morton v. Ruiz*, 415 U.S. 199, 235 (1974) (finding that a policy set forth in the Indian Affairs Manual restricting eligibility for general assistance benefits to "Indians living 'on reservations'" was unenforceable for lack of publication in the Federal Register).

We conclude that the Knee Joint Stability Rule was required to be published in the Federal Register under section 552(a)(1) and that we consequently have jurisdiction under section 502.  In so holding, we overrule our contrary decisions in *Disabled American Veterans v. Secretary of Veterans Affairs*, 859 F.3d 1072 (Fed. Cir. 2017), and *Gray v. Secretary of Veterans Affairs*, 875 F.3d 1102 (Fed. Cir. 2017), *vacated and remanded by Gray v. Wilkie*, 139 S. Ct. 2764 (2019), *vacated and dismissed as moot by Gray v. Sec'y of Veterans Affs.*, 774 F. App'x 678 (Fed. Cir. 2019).

III. Final Agency Action – The Knee Joint Stability Rule

The government argues that even if the Knee Joint Stability Rule constitutes an interpretation of general applicability under section 552, it does not constitute reviewable final agency action.

Section 502 does not itself contain a finality requirement, but instead states that review "shall be in accordance with chapter 7 of title 5."  38 U.S.C. § 502.  In turn, 5 U.S.C. § 704 states that "[a]gency action made reviewable by statute and final agency action for which there is no other

---

nearly identical measurement-based method for assigning knee instability ratings).  The VA never promulgated a final rule implementing the suggested measurement-based evaluation method, but instead revised the Manual to adopt a nearly identical method.

adequate remedy in a court are subject to judicial review." While section 704 does not expressly state that agency action made reviewable by statute must be final, the Supreme Court has recognized that agency judicial review provisions are presumed to have a finality requirement. *See, e.g.*, *Lujan*, 497 U.S. at 894 (stating that "[e]xcept where congress explicitly provides for our correction of the administrative process at a higher level of generality, [courts] intervene in the administration of the laws only when, and to the extent that, a specific 'final agency action' has an actual or immediately threatened effect"); *Bell v. New Jersey*, 461 U.S. 773, 778 (1983) ("The strong presumption is that judicial review will be available only when agency action becomes final . . . ." (citing *FPC v. Metro. Edison*, 304 U.S. 375, 383–85 (1938))). The legislative history of section 704 confirms Congress's presumption of a "finality requirement as a prerequisite for judicial review." *Carter/Mondale Presidential Comm., Inc. v. Fed. Election Comm'n*, 711 F.2d 279, 285 n.9 (D.C. Cir. 1983). Nothing in section 502 overcomes the presumption. Therefore, as we found in *Ashford University, LLC v. Secretary of Veterans Affairs*, "section 502, by incorporating 5 U.S.C. § 704, includes a finality requirement." 951 F.3d 1332, 1344 (Fed. Cir. 2020).

To qualify as final agency action, the Knee Joint Stability Rule must (1) "mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature" and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)) (internal quotation marks omitted). The government argues that the Knee Joint Stability Rule satisfies neither of these requirements because "a regional office's reliance on or reference to a provision in the Manual does not mark the consummation of the agency's decision-making process"

and "[l]egally binding consequences can flow only from the agency's final adjudication of an individual claim in a given case." Resp't Br. 42. We disagree.

First, the Knee Joint Stability Rule marks the consummation of the VA's manual-drafting process and reflects VA's determination that regional office staff must apply the measurement-based rating analysis when evaluating knee instability claims. The provision "is properly attributable to the agency itself and represents the culmination of that agency's consideration of an issue." *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 404 (D.C. Cir. 2020). It is not "of a merely tentative or interlocutory nature," *Bennett*, 520 U.S. at 178, nor is it "only the ruling of a subordinate official," *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) (internal quotation marks omitted). Instead, the Rule was implemented in the Manual following analysis and approval by "a team at VA headquarters," Resp't Br. 4, and at the "direction of the Under Secretary for Benefits," J.A. 1, 66.[11] While it is true that the Knee Joint Stability

---

[11]    The Secretary of Veterans Affairs "delegated" authority, as authorized by 38 U.S.C. § 512(a), "to the Under Secretary for Benefits and to supervisory or adjudicative personnel within the jurisdiction of the Veterans Benefits Administration designated by the Under Secretary to make findings and decisions under the applicable laws, regulations, precedents, and instructions, as to entitlement of claimants to benefits under all laws administered by the Department of Veterans Affairs governing the payment of monetary benefits to veterans . . . ." 38 C.F.R. § 3.100(a). *See Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261, 1269 (D.C. Cir. 2018) ("The manner in which an agency's governing statutes and regulations structure its decisionmaking processes is a touchstone of the finality analysis.").

Rule may be subject to future change, this does not alter the finality analysis.[12]

The government's approach would exclude from review all agency rules, which are non-final in the sense that they may be interpreted, and their validity determined, in later adjudicatory proceedings.  However, the whole regime of challenges to rules assumes that rules are often going to be applied in future individual adjudications.  Parties are routinely permitted to bring pre-enforcement challenges without waiting until they are subject to a pending adjudication involving the rule.  *See, e.g.*, *Abbott Lab'ys*, 387 U.S. at 139–40.  Since *Abbott Laboratories*, "preenforcement review of agency rules and regulations has become the norm, not the exception." *Clean Air Implementation Project v. EPA.*, 150 F.3d 1200, 1204 (D.C. Cir. 1998).  The District of Columbia Circuit has emphasized that "an interpretive rule construing existing law can constitute final [agency] action." *POET Biorefining,* 970 F.3d at 406.

Section 502 is precisely such a statute permitting pre-enforcement review.  As we have previously found, "the judicial review provision of 38 U.S.C. § 502 is another instance in which Congress has declared its preference for preenforcement review of agency rules." *Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans Affs.*, 330 F.3d 1345, 1347 (Fed. Cir. 2003).  Here, despite the potential for future adjudicatory interpretations of the Knee Joint Stability

---

[12]    *See POET Biorefining*, 970 F.3d at 404 ("The possibility of revision 'is a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal.'" (quoting *Hawkes*, 136 S. Ct. at 1814)); *Appalachian Power Co. v. E.P.A*, 208 F.3d 1015, 1022 (D.C. Cir. 2000) ("EPA may think that because the Guidance, in all its particulars, is subject to change, it is not binding and therefore not final action. . . .  But all laws are subject to change.").

Rule, the manual-creating process as to this Rule is complete. The Knee Joint Stability Rule satisfies the first prong of the *Bennett* finality test.

Second, the Knee Joint Stability Rule is a rule "by which rights or obligations have been determined, or from which legal consequences will flow." *Hawkes*, 136 S. Ct. at 1813. The government primarily focuses on this second prong of the finality test, arguing that no legal consequences can flow from the Knee Joint Stability Rule until the rule is applied in the adjudication of a benefits claim.

The government's theory is that the Rule lacks legal consequences because it is not binding on the agency as a whole, but only on front-line adjudicators. The "'pragmatic' approach [the Supreme Court] ha[s] long taken to finality" is inconsistent with the government's position. *Hawkes*, 136 S. Ct. at 1815. In *Hawkes*, the Court found that jurisdictional determinations issued by the Army Corps of Engineers were reviewable final agency action because they bound the agency for five years, even though they were not binding in citizen suits. *Id.* at 1814–15. So too in *Frozen Food Express v. United States*, the Court used a pragmatic approach to finality that is even more clearly pertinent here. 351 U.S. 40 (1956).

In *Frozen Food*, the Court evaluated the finality of an Interstate Commerce Commission order clarifying which commodities constituted an "agricultural product" that could be transported by common carriers without a permit from the Commission. *Id.* at 41–42. The Court held that this order was final agency action based on the order's "immediate and practical impact," despite the fact that the order did not itself subject any regulated entity to an enforcement action or sanction, *id.* at 44–45, and despite the "Commission's willingness, in individual cases, to reconsider its determinations with respect to particular commodities," *id.* at 47 (Harlan, J., dissent). *See also Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 637 (D.C. Cir.

2019) ("*Hawkes* instructs that whether an agency action has direct and appreciable legal consequences is a 'pragmatic' inquiry . . . based on the concrete consequences an agency action has or does not have as a result of the specific statutes and regulations that govern it." (internal quotation marks omitted)); *POET Biorefining,* 970 F.3d at 405 (same).

Here, interpretive rules in the Manual have a practical effect on veterans seeking benefits. Because nearly all veteran benefits claims are resolved at the regional office stage, the Manual is effectively "the last word for the vast majority of veterans." *Gray*, 875 F.3d at 1114 (Dyk, J., dissenting in part and concurring in the judgment); *compare* U.S. Dep't of Veterans Affairs, FY 2021 Budget Submission, BVA-169 (Feb. 2020), https://www.va.gov/budget/docs/summary/fy2021VAbudgetvolumeIIIbenefitsBurialProgramsAndDeptmentalAdministration.pdf (stating that more than 1.3 million disability compensation rating claims were completed in 2019) *with id.* at BVA-278 (stating that the Board received 78,344 appeals in 2019). It typically takes years for challenges to regional office determinations to plow through adjudication before finally reaching the Board. *See Martin v. O'Rourke*, 891 F.3d 1338, 1350 (Fed. Cir. 2018) (Moore, J., concurring) ("In total the appeals process takes over five and a half years on average from the time a notice of disagreement is filed until the Board issues a decision, which often sets the stage for more proceedings on remand." (emphasis removed)).

Insulating interpretive rules contained in the Manual from judicial review would also be inconsistent with the approach taken by our sister circuits. For example, in *Appalachian Power*, the District of Columbia Circuit found that an EPA guidance document explaining when and how "periodic monitoring" of emissions was required under the Clean Air Act was final agency action. 208 F.3d at 1019–23. The court explained that while the Guidance was

not a legislative rule, it had "as a practical matter, . . . a binding effect" sufficient to find finality because of its impact on state authorities. *Id.* at 1020–23. This was so even though the document contained a disclaimer expressly stating that it was "intended solely as guidance, [did] not represent final Agency action, and cannot be relied upon to create any rights enforceable by any party." *Id.* at 1023.

Applying a similarly practical approach, the Fifth Circuit, in *Texas v. EEOC*, found that an EEOC guidance document was reviewable final agency action because the guidance "binds EEOC staff to an analytical method in conducting Title VII investigations and directs their decisions about which employers to refer for enforcement actions." 933 F.3d 433, 443 (5th Cir. 2019). In so holding, the court rejected the EEOC's argument that the guidance "'applies solely to how the EEOC conducts a preliminary, non-final step in the administrative process,' i.e., how it investigates a charge of discrimination and decides whether to issue a right-to-sue letter." *Id.* at 444. Finally, in *Natural Resources Defense Council v. EPA*, the District of Columbia Circuit found an EPA guidance document constituted reviewable final agency action because it removed the discretion of Regional Air Division Directors to refuse to accept state emission-control plans that did not comply with a specific EPA standard. 643 F.3d 311, 319–20 (D.C. Cir. 2011). The court concluded that "the Guidance binds EPA regional directors and thus qualifies as final agency action." *Id.*

Our finality determination is further supported by the fact that VA has sought, and received, *Auer* deference for its Manual provisions, i.e., deference to the agency's interpretations in the Manual of the agency's regulations. *See Mason v. Shinseki*, 743 F.3d 1370, 1374–75 (Fed. Cir. 2014); *Smith v. Shinseki*, 647 F.3d 1380, 1385 (Fed. Cir. 2011); *Thun v. Shinseki*, 572 F.3d 1366, 1369 (Fed. Cir.

2009).[13]   Under *Bennett*, final agency action must constitute the "consummation of the agency's decisionmaking process . . . [and] must not be of a merely tentative or interlocutory nature."   520 U.S. at 178 (internal quotation marks omitted).   The Supreme Court has similarly stated that *Auer* deference is only appropriate for regulatory interpretations "actually made by the agency.   In other words, it must be the agency's 'authoritative' or 'official position,' rather than any more ad hoc statement not reflecting the agency's views."  *Kisor v. Wilkie*, 139 S. Ct. 2400, 2416 (2019).   The granting of *Auer* deference to Manual provisions therefore shows "the requisite legal consequences for APA finality purposes."  *Air Brake Sys., Inc. v. Mineta*, 357 F.3d 632, 644 (6th Cir. 2004).[14]

---

[13]   The Supreme Court has recognized the significance of other manuals by relying on them to interpret an agency's statutory obligations.   *See Wash. State Dep't of Soc. & Health Servs. v. Guardianship Est. of Keffeler*, 537 U.S. 371, 385 (2003) (noting that the Social Security Administration's Program Operations Manual System's definitions of "legal process" were "not products of formal rulemaking, [but] they nevertheless warrant respect"); *see also Shalala v. Guernsey Mem'l Hosp.*,  514 U.S. 87, 90– 91,101–02 (1995) (finding that the Medicare Provider Reimbursement Manual was a valid interpretive rule and that "it was reasonable for the Secretary to follow that policy here to deny respondent's claim for full reimbursement of its defeasance loss").

[14]   Indeed, Manual provisions have greater practical impact on other benefits cases than Board decisions, which are not binding in future cases and appear not to be entitled to *Auer* deference.  *Kisor*, 139 S. Ct. at 2424 (stating that the Solicitor General suggested that *Auer* deference may not be appropriate for Board decisions because "all 100

Because the Knee Joint Stability Rule is an interpretive rule of general applicability and constitutes reviewable final agency action, we have jurisdiction over NOVA's petition for review under section 502.

### IV. The Knee Replacement Rule

We now turn to the Knee Replacement Rule. NOVA has amended its petition for review to challenge both the 2015 Interpretive Guidance published in the Federal Register as well as the Knee Replacement Manual provision. This Rule, whether published in the Federal Register or in the Manual, would be reviewable under section 502 for the same reasons explained above for the Knee Joint Stability Rule. It constitutes an interpretive rule under section 552(a)(1).

However, the question is whether the Manual provision or the agency's earlier publication in the Federal Register is reviewable. The Manual provision is reviewable only if it makes a substantive change to the Rule and supersedes the Federal Register publication. It is not reviewable if it is merely a republication of the previous Federal Register Notice.

This is so because Manual provisions that merely republish prior agency interpretations or restate existing law need not be published under section 552(a)(1) and are not reviewable under section 502.[15] They also do not constitute

---

or so members of the VA Board act individually" and their decisions have "no 'precedential value'").

[15] *See Knutzen v. Eben Ezer Lutheran Hous. Ctr.*, 815 F.2d 1343, 1351 (10th Cir. 1987) (finding that Housing and Urban Development memoranda did not need to be published in the Federal Register under section 552(a)(1) because they "merely reiterate the statutory and regulatory rule" already in place); *Stuart-James Co., Inc. v. S.E.C.*, 857 F.2d 796, 801 (D.C. Cir. 1988) (finding that the SEC

final agency action.[16]

We leave it to the merits panel to determine whether the Manual provision containing the Knee Replacement Rule merely reiterates the 2015 Interpretive Guidance or is independently a reviewable interpretive rule. However, since either the 2015 Interpretive Guidance or the Manual

---

was not required to publish its interpretation of "unrealized profit" under section 552(a)(1) because the interpretation "merely explained an already existing regulation; it did not 'adopt new rules or substantially modify existing rules, regulations, or statutes.'" (quoting *Lewis v. Weinberger*, 415 F. Supp. 652, 659 (D.N.M.1976))); *Notaro v. Luther*, 800 F.2d 290, 291 (2d Cir. 1986) (concluding that a provision in a correctional facility training manual did not need to be published under section 552(a)(1) because it did not have a "substantive impact" and was in accord "with the Commission's regulations and past practices."); *D&W Food Ctrs., Inc. v. Block*, 786 F.2d 751, 757 (6th Cir. 1986) (holding under section 552(a)(1) that an interpretation is not "'of general applicability' if (1) only a clarification or explanation of existing laws is expressed, and (2) the interpretation results in no significant impact on any segment of the public."); *see also Anderson v. Butz*, 550 F.2d 459, 463 (9th Cir. 1977) (finding that a provision in the Food Stamp Certification Handbook announced a change in agency practice and therefore needed to be published under section 552(a)(1)).

16    *See Hyatt v. U.S. Patent & Trademark Office*, 904 F.3d 1361, 1372 (Fed. Cir. 2018); *Mendoza v. Perez*, 754 F.3d 1002, 1018 (D.C. Cir. 2014) ("The APA makes reviewable 'final agency action.' . . . Because an agency's renewal of an earlier decision does not alter the status quo, it does not restart the statute of limitations.").

provision is reviewable under section 502, this court has jurisdiction over NOVA's amended petition.

## V.   Timeliness of NOVA's Challenge

Because we find that we have section 502 jurisdiction over NOVA's petition for review, we must determine whether NOVA's challenge is timely.

Section 502 "does not contain its own statute of limitations." *Preminger v. Sec'y of Veterans Affs.*, 517 F.3d 1299, 1307 (Fed. Cir. 2008). Under section 2401 of title 28 of the United States Code, "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a). In *Preminger*, this court held that the six-year statute of limitations in § 2401(a) applies to pre-enforcement challenges under 38 U.S.C. § 502. 517 F.3d at 1307. In reaching this conclusion, we noted that our sister circuits have consistently found that actions for judicial review under the APA are subject to the limitations period in section 2401(a). *Id.*

The government agrees that section 2401 applies to this case but argues that our local rule concurrently shortens the time to file a petition for review and "governs section 502 actions in tandem with section 2401(a)." Resp't Br. 51.

Local Rule 15(f) states that:

A petition for judicial review of an action of the Secretary of the Department of Veterans Affairs under 38 U.S.C. § 502 must be filed with the clerk of court within sixty (60) days after issuance of the action challenged in the petition.

Fed. Cir. R. 15(f).

*Preminger* did not address the apparent conflict between the 60-day limitations period set by Federal Circuit Rule 15(f) and the six-year limitations period set by

Congress in section 2401(a).  But, in earlier cases we have held that petitioners must comply with the 60-day limit in Federal Circuit Rule 47.12(a).  *See, e.g.*, *Jackson v. Brown*, 55 F.3d 589, 592 (Fed. Cir. 1995) ("[A] request for Section 502 review in this court had to be filed within 60 days of the issuance" of the challenged VA action); *Samudio v. Sec'y, Dep't of Veterans Affairs*, 14 F.3d 612 (Table), 1993 WL 525463 (Fed. Cir. 1993) (unpublished); *Nuevas v. Sec'y of Dep't of Veterans Affairs*, 9 F.3d 977 (Table), 1993 WL 452676 (Fed. Cir. 1993) (unpublished).

Thus, the question before us is whether this court can promulgate rules setting a shorter limitations period than the applicable statutory limitations period set by Congress. This question has significance for this case.  The 2015 Interpretive Guidance was published in the Federal Register on July 16, 2015, and the Knee Replacement Manual provision was promulgated in November 2016.  The Knee Joint Stability Rule was promulgated in April 2018.  Therefore, NOVA's petition for review was brought well within section 2401(a)'s six-year limitation period.  However, NOVA's petition was brought long after this court's 60-day deadline had passed.  NOVA's challenge is timely only if this court's rule is unenforceable as inconsistent with section 2401(a).

We find that 28 U.S.C. § 2401(a) alone governs the time limit for bringing pre-enforcement claims under Section 502.  This court has power to promulgate rules for conducting court business.  28 U.S.C. § 2071(a).  However, "[s]uch rules shall be consistent with Acts of Congress."  *Id.*  We are aware of no appellate decisions that have approved a local rule *either* expanding *or* limiting the time to file a claim where a statutory time limit applies.

The courts of appeals have uniformly rejected district court rules setting a time limit inconsistent with the Federal Rules of Civil Procedure.  *See, e.g.*, *Paluch v. Sec'y Pa. Dep't Corr.*, 442 F. App'x 690, 692–93 (3d Cir. 2011)

(finding that district court's local rule could not impose a 14-day period to file a motion to alter or amend the judgment when Federal Rule of Civil Procedure 59(e) allowed 28 days to file such a motion); *Jackson v. Crosby*, 375 F.3d 1291, 1296 (11th Cir. 2004) (finding that a district courts local rule could not provide three extra days for filing a Rule 59 motion because this was inconsistent with Fed. R. Civ. P. Rule 6(b)'s "ban on extending the rule's ten-day limitations period"); *In re Paoli R.R. Yard PCB Litig.*, 221 F.3d 449, 459 (3d Cir. 2000) (finding that a district court local rule permitting challenges to court costs within five days "after notice of such taxation" was "a nullity" "insofar as [it] conflicted with Rule 54(d)(1)").[17]

---

[17] The government relies on cases declining to apply the six-year limitations period of section 2401(a) to Age Discrimination in Employment Act ("ADEA") claims to support its argument that "[c]ourts have rejected the contention that when section 2401(a) applies in the absence of a specific statutory time limit, it provides the only applicable time limit." Resp't Br. 52.

However, these cases relied on the logical inconsistency that would result from applying the six-year limitation period from section 2401(a) to ADEA claims against the federal government in light of the 90-day statutory limitation period provided for ADEA claims against a private employer. *See Price v. Bernanke*, 470 F.3d 384, 388 (D.C. Cir. 2006) (stating that applying section 2401 "would lead to the anomalous result that a 90-day statute of limitations would apply for claims brought against a private employer under the ADEA, . . . but a period of six years would apply for claims against the federal government"); *Edwards v. Shalala*, 64 F.3d 601, 605 (11th Cir. 1995) ("Further, it is inconsistent to suggest that Congress would allow a two to three year statute of limitations for a claim brought against a private employer, but provide a period up to six years for

In contexts other than that of court rules adopted under 28 U.S.C. § 2071, the Supreme Court has disallowed court departures from statutory limits. In *Bowles v. Russell*, the Supreme Court held that a district court order may not extend the jurisdictional time limit for filing a notice of appeal beyond the statutory time limit for filing such an appeal. 551 U.S. 205, 206–07 (2007) (finding that a petitioner's notice of appeal was untimely when filed within the 17-day period allowed by the district court's order but after the 14-day period allowed by Rule 4(a)(6) and 28 U.S.C § 2107(c)). And the Supreme Court has held that courts do not have authority to "jettison Congress' judgment on the timeliness of suit" by truncating a statutory limitations period. *Petrella v. Metro-Goldwyn-Mayer*, 572 U.S. 663, 667 (2014) (rejecting the application of laches to bar a copyright claim brought within the statutory limitations period); *see also SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 137 S. Ct. 954, 960–61 (2017) (holding that laches cannot be invoked as a defense against a claim for patent infringement damages brought within the 35 U.S.C. § 286 six-year limitations period); *id.* at 960 ("When Congress enacts a statute of limitations, it speaks directly to the issue of timeliness and provides a rule for determining whether a claim is timely enough to permit relief.").

The government seeks to distinguish *Petrella* and *SCA Hygiene* (and presumably the other cases as well) on the ground that they dealt with statutory time limits specific to a particular area of the law, while "section 2401(a) is not part of the VJRA and, therefore, does not 'reflect[] a

claims brought against the government."); *Lavery v. Marsh*, 918 F.2d 1022, 1026–27 (1st Cir. 1990) ("'[I]t would indeed be anomalous to hold . . . that a federal catch-all provision governs with respect to ADEA claims when there are available other relevant statutory provisions more specifically geared to the claim brought.'").

congressional decision' concerning section 502 claims authorized by the VJRA." Resp't Br. 55. The government's argument is unavailing. Congress "kn[o]w[s] how to impose" a more limited statutory time limit on challenges to agency action "when it [chooses] to do so." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 176–77 (1994); *see also State Farm Fire & Cas. Co. v. U.S. ex rel. Rigsby*, 137 S. Ct. 436, 444 (2016) ("Again, the FCA's structure shows that Congress knew how to draft the kind of statutory language that petitioner seeks to read into § 3730(b)(2)."); *Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 394 (2015) ("As those examples show, Congress knew how to distinguish between regulations that had the force and effect of law and those that did not, but chose not to do so in Section 2302(b)(8)(A).").

For example, the Hobbs Act, which governs judicial review of actions by several agencies including the Federal Communication Commission, Department of Agriculture, and Department of Transportation, expressly includes a time limit on judicial review. *See* 28 U.S.C. § 2344 (providing a 60-day period for review of final agency orders under the Hobbs Act). Numerous other statutes similarly provide time limits for judicial review and depart from the six-year statute of limitations under section 2401. *See* 2 U.S.C. §1407(c)(3) (providing a 90-day deadline for challenges to final decision of the Office of Compliance); 7 U.S.C. § 2461 (providing a 60-day window for challenges to actions by the Secretary of Agriculture); 15 U.S.C. § 2060 (providing a 60-day window for challenging consumer product safety rules); 15 U.S.C. § 2618 (providing a 60-day period to challenge rules related to the control of toxic substances); 28 U.S.C. § 1296(b) (providing a 30-day deadline for review of actions of the Secretary of Labor); 30 U.S.C. § 1276(a)(1) (providing a 60-day period for review of certain Environmental Protection Agency actions related to coal mining); 33 U.S.C. § 2717(a) (providing a 90-day period of review for challenges to regulations

promulgated under the Oil Pollution Act of 1990); 41 U.S.C. § 7107(a)(1) (providing a 120-day deadline for challenges to decisions by the Board of Contract Appeals); 42 U.S.C. § 7607(b)(1) (providing a 60-day period for challenging Environmental Protection Agency action under the Clean Air Act).

The fact that Congress chose not to impose such a limit in section 502 is powerful evidence that Congress intended section 2401(a) to govern. *See, e.g.*, *Pinter v. Dahl*, 486 U.S. 622, 650 (1988) (finding that a statute's "failure to impose express liability for mere participation in unlawful sales transactions suggests that Congress did not intend that the section impose" this liability because, as shown by other statutes imposing this kind of liability, "[w]hen Congress wished to create such liability, it had little trouble doing so."); *see also Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1217 (11th Cir. 2015) ("Where Congress knows how to say something but chooses not to, its silence is controlling.").

The government also argues that Congress has approved of the "constraints imposed by Rule 15(f)," Resp't Br. 54, because a senate report to the Veterans' Benefits Improvement Act of 2008 acknowledged Rule 15(f)'s 60-day limit when discussing legislation allowing section 502 challenges to VA's schedule of ratings, *see* S. Rep. No. 110-449, at 14 (2008). However, this kind of offhand statement, made in connection with subsequent legislation, is not a reliable indicator of Congress's intent when drafting section 502. *See Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1747 (2020) ("Arguments based on subsequent legislative history . . . should not be taken seriously, not even in a footnote." (quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 632 (1990) (Scalia, J., concurring))).

Although Congress may wish to amend section 502 to incorporate a shorter time limit on bringing pre-enforcement claims, that decision is for Congress, and not this

court, to make.  Rule 15(f)'s 60-day limit is invalid, and petitioner's petition is timely because it was filed within six years of the challenged agency action.

## CONCLUSION

NOVA has associational standing to challenge both the Knee Joint Stability Rule and Knee Replacement Rule. This court has jurisdiction over NOVA's challenge to the Knee Joint Stability Rule under 38 U.S.C. § 502.  We also have jurisdiction to review the Knee Replacement Rule. However, we refer to the panel whether the Rule is reviewable as a Manual provision or as a Federal Register publication.    The challenged Rules constitute final agency action.  Finally, we hold that Federal Circuit Rule 47.12(a), now republished at Rule 15(f), is invalid as inconsistent with 28 U.S.C. § 2401(a) and the petition is timely.

The petition for review is therefore granted, and the case is referred to a panel for disposition on the merits.

## GRANTED

## COSTS

No costs.