# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 18-6970

JAMES R. HEALEY, APPELLANT,

V.

DENIS MCDONOUGH,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued July 23, 2020                                          Decided February 24, 2021)

*Bradley W. Hennings*, with whom *Maura J. Clancy* was on the brief, both of Providence, Rhode Island, for the appellant.

*Mark J. Hamel*, with whom *Richard J. Hipolit*, Acting General Counsel; *Mary Ann Flynn*, Chief Counsel; and *James B. Cowden*, Deputy Chief Counsel, were on the brief, all of Washington, D.C., for the appellee.

Before ALLEN, MEREDITH, and TOTH, *Judges*.

TOTH, *Judge*, filed the opinion of the Court. MEREDITH, *Judge*, filed an opinion concurring in the judgment.

TOTH, *Judge*: The Board reopened but denied Navy veteran James R. Healey's claim for service connection for hypertension.[1] He appeals, arguing principally that the National Academy of Sciences (NAS) report called *Veterans and Agent Orange: Update 2012* (2012 Update), supplied enough evidence of a potential connection between hypertension and herbicide exposure to trigger VA's duty to seek a medical nexus opinion on the question. We rejected such an argument in *Euzebio v. Wilkie*, 31 Vet.App. 394, 402 (2019), holding that the 2014 Update[2] was not constructively before the Board and, therefore, could not be considered by the Court in determining whether the duty to provide an examination had been triggered.

---

[1] The Board remanded the issues of whether Mr. Healey is entitled to benefits for allergic rhinitis, asthma, chronic obstructive pulmonary disease, esophageal stricture, and dysphagia, all as secondary to service-connected non-Hodgkin's lymphoma, and a total disability rating based on individual unemployability. The remanded matters are not before the Court. *See Breeden v. Principi*, 17 Vet.App. 475, 478 (2004).

[2] There, the Update at issue was created by NAS in 2014, released by NAS in 2016 and published in the Federal Register in 2016. Any substantive differences between the NAS updates considered in *Euzebio* and here are irrelevant to the current appeal.

Mr. Healey says his situation is different due to the intervening promulgation of the *Purplebook*, a compendium of standard procedures and considerations guiding the Board's adjudication of veterans' benefits claims. The *Purplebook* states that VA is on notice as to the 2012 Update and its contents and that, in hypertension cases with conceded exposure to herbicides, the Board must obtain a medical opinion as to whether the two are linked. The Secretary counters that the Board has no duty to discuss the 2012 Update since the *Purplebook* is not "binding" and that this case cannot be distinguished from *Euzebio*.

We do not believe this case requires us to either apply or distinguish *Euzebio*; we think *Overton v. Wilkie*, 30 Vet.App. 257 (2018), provides a more salient basis to resolve this case. There, we held that the Board cannot ignore a relevant provision in VA's *Adjudication Procedures Manual* (M21-1), even though that manual is non-binding on Board members. Instead, the Board must, as part of its duty to provide adequate reasons or bases supporting its decision, present a reasoned, independent determination on how to resolve the issue addressed by the manual provision.

Because the *Purplebook* provision Mr. Healey cites is relevant to the issue of whether a medical nexus opinion was warranted in these circumstances, the Board erred in not addressing it. So, irrespective of whether the *Purplebook* binds the Board, this omission requires that we vacate the decision on appeal and remand for further proceedings. We also briefly address Mr. Healey's secondary argument at the end of this opinion.

## I. BACKGROUND

Mr. Healey served in the Navy from 1965 to 1969, including more than two years in Vietnam where he was exposed to herbicides. *See* 38 U.S.C. § 1116. After leaving active duty, he entered the Navy Reserve and served from 1974 to 1995. In 2009, he filed a claim for service connection for hypertension, diabetes, and non-Hodgkin's lymphoma (NHL). R. at 2051-64. He asserted that NHL and diabetes were caused by his herbicide exposure and that he was diagnosed with high blood pressure around 1978, during his Naval Reserve period. R. at 2057.

VA obtained a medical opinion in July 2009. R. at 1743-55. The VA examiner opined that the veteran's hypertension was not a "complication" of diabetes, reasoning that there was no evidence of diabetic neuropathy, worsening hypertension, or diabetic medication usage. R. at 1749.

2

The Agency granted Mr. Healey's claims for service connection for diabetes and NHL as those conditions are presumed to be related to his herbicide exposure. R. at 1709-17. But VA denied the hypertension claim, finding that his hypertension began during his Navy Reserve service and not active duty. R. at 1716. Mr. Healey did not timely appeal, and the decision became final.

In 2014, VA published an NAS biennial "Update" addressing the relationship between hypertension and herbicide exposure. *Veterans and Agent Orange: Update 2012*, 79 Fed. Reg. 20,308 (Apr. 11, 2014). These Updates are not specific to any particular veteran. NAS instead creates them for the Secretary, who considers[3] the Updates, as well as other "sound medical and scientific evidence," and uses them to "prescribe regulations providing that a presumption of service connection is warranted" when he determines "that a positive association exists between" a disease and herbicide exposure. 38 U.S.C. § 1116(b)(1), (2).

The 2014 Update concluded that there was a "limited or suggestive" relationship between hypertension and herbicide exposure.[4] 79 Fed. Reg. at 20,310. In response, VA did not add hypertension to the list of conditions presumed to be related to herbicide exposure, and it was not added to Mr. Healey's claims file.

In August 2015, Mr. Healey sought to reopen his hypertension claim. R. at 1529-35. He asserted that he suffered from this condition, along with several others, as a result of his treatment for NHL. R. at 1534. He also noted that he qualified as an "in-country" Vietnam veteran. *Id.*

VA obtained a medical examination shortly thereafter to determine whether the veteran's hypertension was related to his NHL treatment. The VA examiner characterized the condition as "benign essential" hypertension and opined that it was not related to NHL therapy. R. at 1247. VA reopened but denied Mr. Healey's claim, and he appealed. In his Notice of Disagreement, he opined that his hypertension was secondary to his diabetes mellitus. R. at 1190. The veteran submitted a 2016 letter from a private physician, who opined that the veteran's hypertension was "directly related" to his service-connected diabetes. R. at 1184.

---

[3] The Secretary was previously *required* to consider the Updates, but that requirement expired in September 2015. *See* 38 U.S.C. § 1116(e).

[4] NAS also released Updates, created in 2006, 2008, and 2010, that all found a limited or suggestive relationship between hypertension and herbicide exposure. *See* 79 Fed. Reg. at 20,310.

Because the veteran submitted new medical records and a private medical opinion, VA requested an addendum medical opinion as to whether the new evidence would alter the opinions offered by the 2015 examiner. R. at 221. A new opinion was provided in April 2017. The examiner stated that, after review of the new documents, her 2015 opinion did not change: the veteran's hypertension was not caused or aggravated by treatment for service-connected NHL. R. at 104. The examiner reasoned that the veteran's hypertension developed before NHL treatment and remained "well controlled and stable" thereafter. R. at 104. She also opined that there was no relationship between service-connected diabetes and hypertension. This was so, the examiner thought, because his renal function was "normal and . . . without proteinuria" and because hypertension developed before diabetes and had been well controlled following the diabetes diagnosis. R. at 103.

On March 8, 2018, before the decision on appeal was issued, the Board published the *Purplebook*—a document that describes itself as "encompass[ing] all Board policies and procedures." Appellant's Br., Exhibit A at 2.[5] (Board of Veterans' Appeals, U.S. Dep't of Veterans Affairs, The Purplebook, Version 1.0.0 (March 8, 2018)). Subject to routine updates, it serves as "a repository of guidance for all Board employees on the internal operating processes of the Board" and is meant to "ensure consistency and accountability in the handling of appeals throughout the Board." MEMORANDUM NO. 01-18-04, CHERYL L. MASON, CHAIRMAN, BD. OF VETERANS' APPEALS at 1 (Mar. 29, 2018) (Mason Memo).

The *Purplebook* discusses the 2012 Update under a section titled "Adjudicatory Best Practices" and a subsection titled "Agent Orange Claims." Appellant's Br., Exhibit A at 3. It states: "Although VA has not conceded a relationship between hypertension and Agent Orange," NAS concluded that there is "limited or suggestive evidence" of a relationship between hypertension and Agent Orange. *Id.* The document goes on to explain that this means the "'evidence suggests an association between exposure to herbicides and the outcome, but a firm conclusion is limited because chance, bias, and confounding [factors] could not be ruled out with confidence.'" *Id.* (quoting 79 Fed. Reg. at 20,309). And because a summary of this evolution was published in the Federal Register, "VA is on notice as to the information contained therein." *Id.*

From this, the *Purplebook* concludes that the suggestive evidence category can "arguably be sufficient to establish an 'indication' that the current disability 'may be related' to herbicide

---

[5] The exhibit's pages have not been numbered, so this citation refers to the second page of the exhibit.

4

exposure during service, as contemplated by 38 U.S.C. § 5103[A](d)(2)(b)." *Id.* at 4 (quoting *McLendon v. Nicholson*, 20 Vet.App. 79, 83 (2006)). For these reasons, it advises that VA's Office of General Counsel's Litigation Group "will not defend [service connection] hypertension cases when a VA nexus opinion has not been obtained." *Id.* The upshot is that, in "cases where presumptive (or actual) exposure to Agent Orange has been conceded," the Board should "not deny service connection for hypertension . . . without first obtaining a VA medical opinion on the nexus element." *Id.* at 3.

On October 15, 2018, the Board issued the decision on appeal. R. at 4-16. It did not address a theory of direct service connection, including whether Mr. Healey's hypertension was related to his presumed herbicide exposure or whether the duty to assist required it to obtain a medical opinion to adjudicate that theory of entitlement. Rather, the Board found that the veteran's hypertension was not caused or aggravated by either service-connected diabetes or treatment for service-connected NHL. In reaching this conclusion, the Board found the 2015 and 2017 VA medical opinions to be highly probative, "as they represent[ed] the informed conclusions of a physician with relevant expertise, [were] based on a review of the claims file, the clinical findings made on examination, and the symptomatology reflected in the medical and lay evidence of record, and [were] supported by a clear, well-reasoned explanation with citations to the evidence of record and references to relevant medical literature." R. at 10-11.

On appeal, Mr. Healey presents two main arguments, both related to the duty to assist. Relying on the 2012 Update, he first argues that the Board erred when it did not address the reasonably raised theory that his hypertension may be directly related to his exposure to herbicides. Although the NAS Update is not in his claims file, Mr. Healey argues that it was in the Board's constructive possession due to its inclusion in the *Purplebook*. In response, the Secretary contends that the Board did not have constructive possession of the NAS Update because it has no direct relationship to Mr. Healey's claim—a requirement of our constructive possession jurisprudence. The Secretary further contends that there is no duty to address any matters raised by the *Purplebook*, as its contents are not binding on the Board.

Second, Mr. Healey challenges the adequacy of the VA medical opinions of record and asserts that the rationales provided by the examiners were insufficient. He maintains that the Board erred when it relied on the 2015 and 2017 VA examination reports to conclude that his hypertension was not related on a secondary basis to his service-connected diabetes or NHL. For

5

his part, the Secretary maintains that the examiner's rationales were adequate for the Board to decide the matter of secondary service connection.

## II. ANALYSIS

### A. Direct Service Connection

The primary issue here is whether the duty to assist obligated the Board to obtain a medical opinion on a theory of direct service connection between hypertension and in-service herbicide exposure that, he says, may have been reasonably raised by the record. The Board must investigate reasonably raised theories of service connection, and whether a theory is reasonably raised generally depends on the evidence that is in the record before the agency. *Robinson v. Peake*, 21 Vet.App. 545, 552-53 (2008), *aff'd sub nom. Robinson v. Shinseki*, 557 F.3d 1355 (Fed. Cir. 2009). Thus, the Board is not obliged to "assume the impossible task of inventing and rejecting every conceivable argument in order to produce a valid decision." *Id.* at 553.

Given that the "reasonably raised" standard is highly fact specific, we haven't set forth a clear test for when it is met. We have, however, noted a correlation between that standard and the threshold for triggering the obligation under the duty to assist to obtain a medical opinion: whether evidence "'indicates'" that a disability "'may be associated'" with service. *DeLisio v. Shinseki*, 25 Vet.App. 45, 53 (2011) (quoting *Robinson*, 21 Vet.App. at 553). Simply put, "the duty to sua sponte investigate whether a primary condition is related to service is only triggered when the evidence satisfies the *McLendon* standard." *Id.* at 63 (Lance, J., concurring). The Court has jurisdiction to determine whether a claim or theory was reasonably raised in the first instance. *Barringer v. Peake*, 22 Vet.App. 242, 244 (2008).

The parties do not focus their arguments on whether the hypertension/herbicide theory was reasonably raised. Instead, they primarily dispute whether the duty to obtain a medical opinion was triggered here. Given the similarity between the standards, we assume for the sake of argument that the theory was reasonably raised and move on to the main event.

The Secretary's duty to assist sometimes requires him to provide a medical examination or obtain a medical opinion when adjudicating claims. 38 U.S.C. § 5103A(d). Under *McLendon*, the Secretary must do so when there is: (1) competent evidence of a current disability or persistent or recurrent symptoms of a disability; (2) evidence establishing that an event, injury, or disease occurred in service; (3) an indication that the disability or persistent or recurrent symptoms of a

disability "may be associated" with the veteran's service or with another service-connected disability; and (4) insufficient competent evidence on file for VA to make a decision on the claim. 20 Vet.App. at 81. The parties' disagreement centers on whether the third element was satisfied. Further, this question is rendered slightly more complicated here because the veteran's argument relies on extra-record materials—the 2012 Updates discussed in the *Purplebook.*

In *Euzebio*, the Court held that the 2014 Update was not constructively before the Board because it did not have a "direct relationship" to a veteran's claim.[6] 31 Vet.App. at 402. Because the Update was not constructively before the Board—and not actually part of the claims file—we concluded that the appellant could not rely on it to indicate, in *McLendon*'s parlance, a potential association between hypothyroidism and herbicide exposure. *Id.* at 402-04, 405. This case presents an issue that *Euzebio* didn't resolve: whether the *Purplebook*'s explicit discussion of the 2012 Update altered the constructive possession analysis. This issue was not ripe for resolution in *Euzebio* because the *Purplebook*'s promulgation postdated the Board decision in that case and so fell outside the materials the Court could consider when reviewing a Board decision. *Id.* at 402 n.3.

Those chronological complexities are not present here. Therefore, we are presented with the question of whether the Board was obliged to consider the *Purplebook* and its discussion of the NAS Update in the context of hypertension claims. The *Purplebook* is the Board's internal manual and is designed to provide members and their staff with a uniform and comprehensive set of considerations for adjudicating appeals. Mason Memo at 1. In this respect, it generally serves the same function that the M21-1 does for adjudicators at VA regional offices. *See Nat'l Org. of Veterans' Advocates (NOVA) v. Sec'y of Veterans Affairs*, 981 F.3d 1360, 1376 (Fed. Cir. 2020) (noting that the M21 is a consolidation of VA's policies and procedures that provides guidance to VA employees and stakeholders). To that end, the *Purplebook* contains "the Board's internal policies and procedures," serves as "a repository of guidance for all Board employees," and is meant to "ensure consistency and accountability in the handling of appeals throughout the Board." Mason Memo at 1. It is even organized around the same numbering system as the M21-1, "to allow for consistency in citation format." Appellant's Br., Exhibit A at 2.

---

[6] Mr. Euzebio appealed our decision to the Federal Circuit (under docket number 20-1072), and oral argument occurred on November 6, 2020.

7

As an internal guidance manual, the *Purplebook*'s provisions lack the force of law and are not substantively binding, as the Board is only bound "by the regulations of the Department, instructions of the Secretary, and the precedent opinions of the chief legal officer of the Department." 38 U.S.C. § 7104(c); *see* 38 C.F.R. § 20.105 (2020) ("The Board is not bound by Department manuals, circulars, or similar administrative issues."). However, its non-binding nature does not render it devoid of legal significance. In *DAV*, the Federal Circuit identified the publication of a guidance manual as "agency action" insofar as the provisions constituted "interpretations adopted by the agency, not published in the Federal Register, not binding on the Board itself, and contained within [at least something akin to] an administrative staff manual." *Disabled American Veterans (DAV) v. Sec'y of Veterans Affairs*, 859 F.3d 1072, 1074, 1077-78 (Fed. Cir. 2017). Notwithstanding its non-binding nature, an agency cannot simply ignore an internal guidance manual when its contents relate to a particular claim or disability. "A veteran adversely affected by a[n] M21-1 Manual provision can contest the validity of that provision as applied to the facts of his case . . . ." *Id*. at 1078.

*Overton* sought to resolve the uncertainty surrounding the Board's adjudicatory obligations in relation to the M21-1. Although the M21-1's provisions were not binding on the Board, the Board member in *Overton* relied on the provisions as substantive rules—namely provisions that excluded naval service on a particular Vietnam waterway from the presumption of herbicide exposure. On this basis, the Board denied service connection. 30 Vet.App. at 259. We recognized that the Board had no duty to apply non-binding M21-1 provisions, *id*. at 263-64, but observed that independence also meant that the Board could not simply cite the M21-1 as providing the rule of decision. "[B]ecause the M21-1 is not binding on the Board, the Board's citation to a manual provision as the only support for a conclusion . . . is inconsistent with the Board's congressionally mandated obligation to provide an adequate statement of reasons or bases for its decisions." *Id.* at 264.

*Overton* recognized that the adoption of a procedure or consideration in a comprehensive guidance manual, even if it is not binding as a matter of substance, amounts to a tacit acknowledgment by the agency that such consideration or procedure is relevant to an adjudication that implicates it. We resolved the tension by noting that, as a relevant factor, the Board couldn't ignore the M21-1 provision, but must conduct an independent review of the underlying consideration addressed by the provision. *Id*. *Overton* thus refocused the relevant inquiry from

8

whether the Board was allowed or obligated to apply a relevant provision to whether it provided a "reasoned explanation" for its decision either to apply or disregard such provision in light of the particular context of the case. "In other words, the Board is required to discuss any relevant provisions contained in the M21-1 as part of its duty to provide adequate reasons or bases, but because it is not bound by those provisions, it must make its own determination before it chooses to rely on an M21-1 provision as a factor to support its decision." *Id.*

At this point, we acknowledge the difference between the cases. Despite declaring itself not bound by the M21-1, the Board in *Overton* resolved the case against the veteran by treating an unfavorable M21-1 provision as dispositive and offered no rationale for its decision beyond citing to the provision itself. Conversely, the Board in this case ignored a potentially favorable provision in the *Purplebook*. Thus, in *Overton*, the Board acted as though it were bound by a manual that doesn't apply to it; here, the Board declined to consider a manual that does apply to it. But this difference shouldn't obscure the fact that the fundamental error committed by the Board in both cases is the same: it failed to consider adequately and address relevant guidance promulgated for the purpose of facilitating the efficient and proper resolution of claims.

Whether a manual is binding or non-binding—and, recall, the Secretary maintains that the *Purplebook* is not binding on the Board—is not the critical consideration. As the Federal Circuit noted in *DAV*, "administrative staff manuals and instructions . . . that affect a member of the public" constitute "agency actions." *DAV*, 859 F.3d at 1075 (citing 5 U.S.C. § 552(a)(2)); *see also NOVA*, 981 F.3d at 1374. Like the M21-1, the *Purplebook* can be deemed analogous to "agency action" insofar as it constitutes interpretations adopted by the agency, notwithstanding the lack of binding effect. *DAV*, 859 F.3d at 1075–76. As was the M21-1 for frontline adjudications, the *Purplebook* was designed to assist Board members and to provide a comprehensive source account of various considerations and procedures that may be relevant to an individual claim or disability. Regardless of whether the *Purplebook* is binding, the Board's public adoption of it as the repository of its "internal guidelines and procedures," Mason Memo at 1, brings it within *Overton*'s rationale.

Since it's appropriate to require the Board to acknowledge its own guidance on a matter falling squarely within its domain, it's likewise proper to regard the inclusion of the NAS Updates in the *Purplebook* as the agency's recognition of their relevance in cases where there is evidence of hypertension and VA has conceded Agent Orange exposure. This squares with a longstanding practice of requiring an agency to follow its own internal guidance and policies even when they

9

impose obligations beyond those imposed by binding legal authorities. *See, e.g.*, *Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("[I]t is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required."); *cf. Voge v. United States*, 844 F.2d 776, 779 (Fed. Cir. 1988) ("[G]overnment officials must follow their own regulations, even if they were not compelled to have them at all."). As the Federal Circuit put this maxim in a nonprecedential decision: "Even when an agency's rules lack the force of law, it may still be compelled to follow them." *Hudick v. Wilkie*, 755 F. App'x 998, 1006 (Fed. Cir. 2018).

In short, where a provision of the *Purplebook* is relevant to a veteran's appeal, the Board must incorporate a discussion of the relevant provision into its analysis. And even as the Board remains free to determine whether or how to apply such provision, it must provide a reasoned basis for departing from the guidance offered by the provision.

Here, the *Purplebook* provision cited by Mr. Healey is relevant to his claim for service connection for hypertension, given that the Board acknowledged that he suffers from that condition and the record contains evidence that VA has conceded herbicide exposure. It instructs that, "where presumptive (or actual) exposure to Agent Orange has been conceded," the Board should "not deny service connection for hypertension . . . without first obtaining a VA medical opinion on the nexus element." Appellant's Br., Exhibit A at 3. Yet, the Board denied service connection for hypertension without obtaining a medical opinion and without acknowledging this passage.

The Secretary defends the Board's lack of discussion by asserting that the provisions were not relevant as this was not a claim for direct service connection. Put differently, he didn't file an "Agent Orange claim"—the title of the *PurpleBook* provision at issue here. However, the Court finds no merit in this defense. Although Mr. Healey's current claim is based on the theory of secondary service connection, his 2009 hypertension claim was adjudicated under a theory of direct service connection. Notably, his 2009 claim included his first allegations that he was exposed to herbicides or had "[Agent Orange] diseases." R. at 2057. The Board must consider all relevant evidence of record in deciding a claim, which would include the veteran's 2009 claim asserting that his hypertension was related to his exposure. And, "even if a claimant believes that his condition is related to service in a particular way, his claim is not limited solely to one theory of service connection." *DeLisio v. Shinseki*, 25 Vet.App. 45, 53 (2011).

Because the record reasonably raised a theory of direct service connection and the Board did not address the relevant *Purplebook* provisions, it offered inadequate reasons or bases to support its denial and its obligation to ensure that all appropriate development had taken place. In addressing the *Purplebook* on remand, the Board should address whether the evidence before it indicates a relationship between hypertension and herbicides such that a VA medical opinion on the question is warranted.

## B. Secondary Service Connection

Secondary service connection is appropriate when a service-connected condition either causes disability or aggravates a preexisting disability. 38 C.F.R. § 3.310(a), (b) (2020). The same is true when the causal or aggravative agent is the treatment for a service-connected condition. *See, e.g., Wanner v. Principi*, 17 Vet.App. 4, 8 (2003) (noting award of secondary service connection for tinnitus caused by medication used to treat service-connected tuberculosis), *rev'd on other grounds*, 370 F.3d 1124 (Fed. Cir. 2004). When VA instructs an examiner to provide an opinion as to secondary service connection, that examiner must separately address the causation and aggravation prongs of secondary service connection. *El-Amin v. Shinseki*, 26 Vet.App. 136, 140-41 (2013). "[A]ggravation of a condition by a service-connected disability is independent of direct causation." *Atencio v. O'Rourke*, 30 Vet.App. 74, 91 (2018). In addition to his direct service-connection argument, Mr. Healey contends that the medical opinions the Board relied on did not adequately address whether diabetes, NHL, or NHL treatment caused or aggravated his hypertension.

Here, the Board noted that the VA examiner, in 2015, opined that hypertension was not proximately due to diabetes or treatment for NHL and, in 2017, opined that the veteran's hypertension was "well-controlled" and thus could not have been caused or aggravated by diabetes or NHL treatment. R. at 10; *see* R. at 103-04, 1247. The veteran argues that the examination reports are inadequate, in part, because the examiner relied on an inaccurate factual premise in opining that his hypertension was "well-controlled," citing evidence regarding the treatment history of his hypertension. Appellant's Br. at 21, 27. In response, the Secretary argues that "[w]ell-controlled does not mean 'unmedicated.'" Secretary's Br. at 11; *see id*. at 17.

In reviewing the Board decision and the parties' interpretations of the exams, the Court is unable to discern why the Board relied on these two opinions. Specifically, it is not apparent why the Board adopted the VA examiner's findings without explaining whether it is factually accurate

11

that the veteran's hypertension was "well-controlled" and why that meant that there was no increase in Mr. Healey's hypertension due to diabetes or NHL treatment. Because the Court is unable to understand how the Board evaluated the meaning of "well-controlled" and how the medical opinion using that term supported its finding that service connection was not warranted, review is frustrated. Therefore, the Court remands so the Board can provide an adequate statement of reasons or bases for its reliance on these two medical opinions.

## IV. CONCLUSION

After review of the parties' briefs, the record, and the relevant law, the Court VACATES the October 15, 2018, Board decision and REMANDS this matter for readjudication consistent with this opinion.


MEREDITH, *Judge*, concurring in the result: Although I agree that remand is warranted, I cannot join in the majority's analysis because it is based on an inaccurate factual premise and does not provide clear guidance on the issue it purports to resolve.

Here, the appellant in 2009 filed a claim for service connection for hypertension, contending that he had been diagnosed with that condition in 1978 while serving in the Naval Reserve. Record (R.) at 2057, 2059-60. In the same application form, the veteran requested benefits for diabetes and non-Hodgkin's lymphoma (NHL), asserting that *those* conditions were "due to [his] exposure to Agent Orange" during his active service in Vietnam from 1966 to 1969. R. at 2060; *see* R. at 2057 (asserting that he has "A[gent] O[range] diseases of [NHL] and type II diabetes"). A VA regional office (RO) subsequently granted benefits for diabetes and NHL but denied service connection for hypertension because it arose during a period of Reserve service rather than active duty service. R. at 1716; *see* R. at 1703-19.

In August 2015, the veteran then submitted a claim for "hypertension *secondary to NHL treatment*," R. at 1530 (emphasis added), asserting in part that he "suffer[s] from a number of medical conditions as a result of [his service-connected] NHL treatments [including] chemotherapy and radiation therapy[]," R. at 1534. In the decision on appeal, the Board of Veterans' Appeals (Board) noted that "[t]he [appellant] contends that his hypertension is related to his service-connected diabetes mellitus or [NHL]" and, accordingly, addressed service connection for hypertension *only* on a secondary basis. R. at 9; *see* R. at 5-6, 8-11. On appeal, the appellant

now contends that the Board erred in failing to obtain a medical opinion addressing whether his hypertension is related to in-service herbicide exposure. Appellant's Brief (Br.) at 8-20.

Because the Board did not address *at all* whether the appellant was exposed to herbicides or whether his hypertension was due to such exposure, the preliminary question is whether the Board had an obligation to address that theory of entitlement. *See Robinson v. Peake*, 21 Vet.App. 545, 553 (2008), *aff'd sub nom. Robinson v. Shinseki*, 557 F.3d 1355 (Fed. Cir. 2009). The majority concludes that it did because "the record reasonably raised" that theory. *Ante* at 10. In that regard, the majority reasons that "[t]he Board must consider all relevant evidence of record in deciding a claim, which would include the veteran's 2009 claim asserting that his hypertension was related to his exposure."[7] *Ante* at 10. This conclusion is problematic for several reasons.

First, as noted above, the 2009 claim on its face contains no such allegation. Rather, the appellant twice specifically asserted that NHL and diabetes were the disabilities he believed were related to herbicide exposure. *See* R. at 2057, 2060. As for hypertension, he alleged that it arose during his Reserve service in the late 1970s and the RO subsequently addressed only that contention. R. at 2057, 2059-60. Simply put, the record does not reflect that the appellant attributed his hypertension to herbicide exposure and, notably, in his briefs to the Court he does not aver that he did. *See* Appellant's Br. at 3, 18-19; Reply Br. at 6.

Second, the pivotal question in this case is whether the Board should have discussed a *Purplebook* provision outlining the possible relationship between hypertension—the appellant's claimed condition—and in-service herbicide exposure. Based on its finding that the appellant explicitly alleged, in a prior claim stream, that his condition was due to such exposure, the majority concludes that the *Purplebook* provision was relevant and should have been discussed. *Ante* at 10. In so doing, the majority does not clearly resolve whether the Board may disregard its own internal guidance where, as here, the veteran does *not* explicitly contend before the Agency that hypertension is due to herbicide exposure;[8] nor does it resolve whether the Board generally is "obliged to consider the *Purplebook . . .* in the context of hypertension claims," *ante* at 7.

---

[7] The majority first suggests that they need not address whether the issue was reasonably raised, *ante* at 6, but then explicitly concludes that it was, *ante* at 10.

[8] As discussed below, I would conclude that the Board was obligated to address an obvious potential path to benefits not raised below by the appellant.

Third, the majority's conclusion may cause confusion as to when an issue will be considered reasonably raised. In that regard, the majority initially notes that "'the duty to sua sponte investigate whether a primary condition is related to service is only triggered when the evidence satisfies the *McLendon*[9] standard,'" *ante* at 6 (quoting *DeLisio v. Shinseki*, 25 Vet.App. 45, 63 (2011) (Lance, J., concurring)), but then never addresses whether or how that standard was satisfied here, *see ante* at 6-10.[10] Rather, the majority determines without analysis that, because the theory of entitlement was purportedly *expressly* raised in a prior claim stream, it was *reasonably* raised in the current claim stream (which the appellant concedes was explicitly based only on secondary service connection, *see* Appellant's Br. at 18). Although I agree that the Board should have addressed possible herbicide exposure under the circumstances of this case, I question whether the majority's holding would require VA to address every theory of entitlement previously asserted, regardless of the evidence and argument before it in a current claim stream. If so, how would that square with *Robinson*'s caution that "the Board is not required sua sponte to raise and reject 'all possible' theories of entitlement in order to render a valid opinion"? *Robinson*, 21 Vet.App. at 553.

I further depart from the majority to the extent that they frame the issue on appeal as whether "a medical nexus opinion was warranted" as to any possible connection between hypertension and herbicide exposure. *Ante* at 2; *see ante* at 6, 10. As noted above, the Board's decision was limited to addressing a theory of secondary service connection and did not address whether service connection was warranted based on such exposure or make any duty to assist findings as to that theory of entitlement. Accordingly, whether the Board should have obtained or discussed the need to obtain a medical examination is not before the Court at this time and it is premature for the majority to opine on it. *See Teva Pharm. USA, Inc. v. Novartis Pharm. Corp.*, 482 F.3d 1330, 1337-38 (Fed. Cir. 2007) ("Under [the prohibition against advisory opinions] doctrine, federal courts are to decide only 'actual controversies by judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in the case before it.'" (quoting *Local No.*

---

[9] *McLendon v. Nicholson*, 20 Vet.App. 79, 81 (2006).

[10] Indeed, by directing the Board on remand to "address *whether* the evidence before it indicates a relationship between hypertension and herbicides," *ante* at 10-11 (emphasis added), the majority appears to suggest that the third prong of the *McLendon* test—whether there is an indication that the disability may be associated with service—has not been satisfied. *McLendon*, 20 Vet.App. at 81.

*8-6, Oil, Chem. & Atomic Workers Int'l Union v. Missouri*, 361 U.S. 363, 367 (1960))); *Norvell v. Peake*, 22 Vet.App. 194, 200 (2008).

Finally, in concluding that the Board should have considered the *Purplebook*, the majority does not adequately take into account the U.S. Court of Appeals for the Federal Circuit's (Federal Circuit) opinion in *National Organization of Veterans' Advocates, Inc. (NOVA) v. Secretary of Veterans Affairs*, 981 F.3d 1360, 1365 (Fed. Cir. 2020). In that regard, the majority stresses that the *Purplebook* is not binding and lacks the force of law because it is a source of internal guidance. *Ante* at 7. But, the Federal Circuit in *NOVA* found that a similar source of internal guidance, the VA *Adjudication Procedures Manual*, was binding on certain VA adjudicators, was essentially substantive in nature, and should have been published in the Federal Register. *NOVA*, 981 F.3d at 1374-82. At a minimum, the Court should acknowledge that it may no longer be a foregone conclusion that internal manuals lack the force of law.

Having said all that, I agree for different reasons that remand is warranted for the Board to discuss the *Purplebook*. Put simply, the unrepresented appellant, by explicitly requesting service connection for hypertension on a secondary basis, should not be considered to have limited the scope of his 2015 claim. *See* Appellant's Br. at 18-19. Rather, in the context of VA's uniquely pro-claimant and nonadversarial claims system, the Board cannot ignore an obvious potential path to benefits when carrying out its duty to sympathetically read a claim and to investigate possible causes that may be unknown to the veteran. *See Robinson*, 21 Vet.App. at 553 ("As a nonadversarial adjudicator, the Board's obligation to analyze claims goes beyond the arguments explicitly made."); *see also DeLisio*, 25 Vet.App. at 53 ("[E]ven if a claimant believes that his condition is related to service in a particular way, his claim is not limited solely to one theory of service connection."); *Clemons v. Shinseki*, 23 Vet.App. 1, 5 (2009) (per curiam order) (finding that, "[a]s a self-represented layperson at the time his claim was filed, the appellant had neither the legal or medical knowledge to narrow the universe of his claim or his current condition"). "Overall, the scope of the claim will be based on a sympathetic assessment of 'the claimant's description of the claim; the symptoms the claimant describes; and the information the claimant submits or that the Secretary obtains in support of the claim,' i.e., the information gathered upon investigation." *DeLisio*, 25 Vet.App. at 53 (quoting *Clemons*, 23 Vet.App. at 5).

Given the evidence of record reflecting that VA granted service connection for other conditions on the basis of presumed herbicide exposure, the Board should at a minimum

acknowledge its own internal guidance (whether binding or not) that the condition for which the appellant now seeks service connection could possibly be related to herbicide exposure. In my view, this would "not require the Board to assume the impossible task of inventing and rejecting every conceivable argument," *Robinson*, 21 Vet.App. at 553, or impose an onerous burden. Indeed, it may be that under some circumstances the Board would not need to address that theory of entitlement on the merits,[11] but VA cannot simply ignore an obvious potential path to benefits that its own guidance acknowledges exists. After all, how could this theory of entitlement not be "reasonably apparent" to the Board, the entity that drafted the *Purplebook* provision detailing this exact theory? *DeLisio*, 25 Vet.App. at 53 ("[U]pon the filing of a claim for benefits, the Secretary *generally must investigate the reasonably apparent and potential causes* of the veteran's condition and theories of service connection that are reasonably raised by the record or raised by a sympathetic reading of the claimant's filing." (emphasis added) (citing *Schroeder v. West*, 212 F.3d 1265, 1271 (Fed. Cir. 2000))).

For these reasons, I agree with the result in this case but do not join in the majority's reasons for reaching that conclusion.

---

[11] A merits adjudication may not be necessary if, for example, the appellant had expressly abandoned that theory of entitlement or if VA had fully adjudicated that theory of entitlement in a different claim stream.